**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Steve LESHUK, Defendant–Appellant.**

**No. 94–5839.**

United States Court of Appeals,
Fourth Circuit.

Argued July 14, 1995.

Decided Sept. 18, 1995.

**1106**

**ARGUED:** Stephen Douglas Herndon, Wheeling, WV, for appellant. Paul Thomas Camilletti, Assistant United States Attorney, Wheeling, WV, for appellee. **ON BRIEF:** Martin P. Sheehan, Sheehan & Nugent, Wheeling, WV, for appellant. William D. Wilmoth, United States Attorney, Wheeling, WV, for appellee.

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

Affirmed by published opinion. Judge RUSSELL wrote the opinion, in which Judge WIDENER and Judge HALL joined.

## OPINION

DONALD RUSSELL, Circuit Judge:

On August 30, 1994, Defendant–Appellant Steve Leshuk agreed to a conditional guilty plea for aiding and abetting the manufacture of marijuana in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). In signing the plea agreement, Leshuk preserved his right to file this appeal. Leshuk now raises various assignments of error challenging his conviction and sentence. Finding that his assignments lack merit, we affirm his conviction and sentence.

### I.

On April 26, 1994, a turkey hunter discovered a marijuana cultivation site in a rural area in Marshall County, West Virginia. That same day, the hunter contacted the local sheriff's office and directed Deputy

Sheriff Joe Cuchta and Deputy Sheriff Michael J. Fluharty of the Ohio Valley Drug Task Force to the site. The site was located approximately one mile through the woods off the travelled road. At the site, Deputy Cuchta observed a chicken wire mesh enclosure surrounding 33 marijuana plants. Each plant was about three or four inches tall and was wet around its base. Vines had been weaved through the mesh to conceal the site.

Shortly after arriving at the site, the deputies and the turkey hunter heard a commotion nearby. The three spread out and moved through the woods towards the commotion to investigate. The turkey hunter first approached the area of commotion, which was located approximately fifty yards from the cultivation site. The hunter called out to the deputies that he had found the defendants, Steve Leshuk and Glen K. Smith. The deputies found the defendants next to two backpacks and Smith also beside a brown plastic garbage bag. Wire mesh similar to that surrounding the cultivation site was attached to the backpacks.

As the deputies approached, the turkey hunter announced "this is the sheriff's office," or words to that effect. The hunter also ordered Leshuk and Smith to raise their hands and stated that the deputies would shoot the defendants' dog if the defendants did not call it off. The deputies then identified themselves as police officers, frisked both defendants, and determined they were not armed. Neither of the deputies was in uniform, and only Deputy Cuchta had a firearm, which was not drawn. The deputies informed the defendants that they were investigating a nearby marijuana site. The deputies asked the defendants about their purpose for being there, but the defendants did not answer. The deputies also asked the

defendants about the contents of the backpacks and the garbage bag, but, according to the deputies' testimony, the defendants denied ownership of the packs and bag.

■ Deputy Cuchta then looked into the garbage bag and found several small marijuana plants in little soil containers. Deputies Cuchta and Fluharty both looked into the backpacks and found a machete, folding shovels, fertilizer, mothballs, containers of water, and other items. The deputies asked about the materials they found, but the defendants did not respond. The deputies also asked the defendants other questions regarding their presence near the site. The defendants identified themselves, and Leshuk stated that he had driven to the site in his pickup truck. At that point, the deputies advised Leshuk and Smith that they were under arrest. The deputies and the defendants began walking back to the police vehicles at the road. At the roadway, Smith tried to run away, but Deputy Cuchta and the turkey hunter chased him down and caught him. After Smith was caught, Deputy Fluharty read *Miranda* warnings to the defendants. At the conclusion of these events, Deputy Fluharty counted 67 marijuana plants in the garbage bag, and another deputy counted 33 marijuana plants in the fenced-in enclosure.[1]

On May 11, 1994, a grand jury in the Northern District of West Virginia returned an indictment charging Leshuk and Smith with manufacturing approximately 100 marijuana plants in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). Both defendants filed motions to suppress, and a hearing on the motions was held before a magistrate judge on June 14, 1994. Deputy Cuchta testified at the hearing, but Deputy Fluharty was ill and

---

1. Law enforcement officers also searched Leshuk's truck after Leshuk signed a consent to search form. During the search, agents discovered germinated marijuana seeds in the glove compartment and a marijuana pipe behind the seat. In his briefs to this Court, Leshuk did not challenge the admission of the evidence from his truck; but, at oral argument, his counsel did briefly contest the admission of the evidence found in the glove compartment. Although we need not reach this argument because Leshuk raised it for the first time before this Court at oral argument, *see Hankerson v. North Carolina,* 432 U.S. 233, 240 n. 6, 97 S.Ct. 2339, 2344 n. 6, 53 L.Ed.2d 306 (1977); *Hunt v. Nuth,* 57 F.3d 1327, 1338 (4th Cir.1995); *Jasperson v. Purolator Courier Corp.,* 765 F.2d 736, 740–41 (8th Cir. 1985), we agree with the district court that the "automobile exception" to the warrant requirement applies and that the officers had probable cause to search Leshuk's vehicle, including the glove compartment, *see United States v. Gastiaburo,* 16 F.3d 582, 586 (4th Cir.), *cert. denied,* ── U.S. ──, 115 S.Ct. 102, 130 L.Ed.2d 50 (1994). In this case, the officers observed wire mesh and potting soil in plain view in the bed of the truck.

was unable to testify. The defendants argued that any statements they made after the initial confrontation with the deputies must be suppressed because the deputies had conducted custodial interrogation without first giving *Miranda* warnings. The defendants also argued that the items found in the garbage bag and the backpacks must be suppressed because the deputies conducted a warrantless search in violation of the defendants' Fourth Amendment rights.

On July 22, 1994, the magistrate judge filed his proposed findings of fact and recommendations for disposition of the issues. The magistrate recommended that the statements made before the deputies read the defendants their *Miranda* rights should be suppressed. However, the magistrate denied the defendants' motions to suppress the items found in the garbage bag and the backpacks.

On August 29, 1994, the district court issued its order responding to Smith's and the government's objections to the magistrate's recommendations.[2] The district court first rejected the magistrate's recommendation that the defendants' statements be suppressed. The court found that the deputies' interrogation eliciting the statements did not violate the defendants' rights to receive *Miranda* warnings, and the court therefore denied the defendants' motions to suppress the statements. From this finding, the court determined that the defendants' denial of ownership in the garbage bag and backpacks was voluntary and was not the result of the deputies' misconduct. Agreeing with the magistrate, the court accordingly denied the defendants' motions to suppress the items found in the garbage bag and the backpacks.

On August 30, 1994, after the jury selection phase of his trial, Leshuk agreed to a conditional guilty plea preserving his right to file this appeal. That same day, the district court reopened hearings on the suppression motions in order to allow Deputy Fluharty to testify. Upon consideration of the additional evidence, the court issued a supplemental decision on August 31, 1994, affirming its earlier ruling. On November 1, 1994, the court sentenced Leshuk to sixty months im-

prisonment and to four years of supervised release.

## II.

### A.

 Leshuk first argues that his denial of ownership and other statements made during the deputies' questioning should be suppressed because the deputies improperly interrogated him without administering warnings pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A person subjected to custodial interrogation is entitled to the procedural safeguards prescribed by *Miranda,* and therefore, any statements a suspect makes during custodial interrogation are inadmissible in the prosecution's case in chief unless prior *Miranda* warnings have been given. *See Stansbury v. California,* —— U.S. ——, ——, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994) (per curiam); *Berkemer v. McCarty,* 468 U.S. 420, 434, 104 S.Ct. 3138, 3147, 82 L.Ed.2d 317 (1984). A suspect is "in custody" for *Miranda* purposes if the suspect has been formally arrested or if he is questioned under circumstances in which his freedom of action is curtailed "of the degree associated with a formal arrest." *Stansbury,* —— U.S. at ——, 114 S.Ct. at 1529 (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam)).

 The magistrate judge recommended that the statements during the interrogation be suppressed based on his finding that a reasonable person in the defendants' position would have understood that he was in custody and not free to leave from the beginning of the encounter, when the defendants were told to raise their hands. Relying on *Berkemer,* the district court rejected the magistrate's recommendation. In *Berkemer,* the Supreme Court held that *Miranda* warnings are not required when a person is questioned during a routine traffic stop or stop pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Berkemer,* 468 U.S. at 437–42, 104 S.Ct. at 3148–52. The district court concluded that the initial encounter

---

**2.** Leshuk did not file objections to the magis- trate's recommendations.

between the deputies and the defendants was equivalent to a *Terry* stop. The court reasoned that the initial approach and inquiry "was of extremely limited intrusiveness and was entirely reasonable under the Fourth Amendment." Joint Appendix ("J.A.") 100. We review for clear error the district court's factual findings as to whether officers sufficiently seized a person so as to require the giving of *Miranda* warnings, and we review *de novo* the court's determination of whether the officers had the reasonable suspicion necessary to warrant a *Terry* stop. *United States v. Perrin*, 45 F.3d 869, 871 (4th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 2287, 132 L.Ed.2d 289 (1995).

■ We note initially that we agree with the district court's determination that Deputy Cuchta and Deputy Fluharty had the requisite reasonable, particularized suspicion necessary to conduct an investigatory *Terry* stop of the defendants. *See United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981) (describing the level of suspicion needed to conduct investigatory stops). The defendants' proximity to the cultivation site, the wire mesh found next to the defendants, and the apparently recent watering of the marijuana plants provided the officers with the requisite suspicion. We therefore turn to address whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879. As a general rule, officers conducting a *Terry* stop are authorized to "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985).

■ Leshuk contends that the scope of the detention exceeded a *Terry* stop and was a custodial interrogation for *Miranda* purposes because a reasonable person in his position would have believed that he was in custody and not free from the very beginning of the encounter until the time the deputies placed Smith and Leshuk under arrest. This objective belief is important to the assessment of whether a stop is considered custodial given

that "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, — U.S. at —, 114 S.Ct. at 1529. Such an objective belief, however, does not necessarily transform a lawful *Terry* stop into a custodial interrogation requiring *Miranda* warnings. As this Court has reasoned, "[t]he perception ... that one is not free to leave is insufficient to convert a *Terry* stop into an arrest. A brief but complete restriction of liberty is valid under *Terry*." *United States v. Moore*, 817 F.2d 1105, 1108 (4th Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987); *see also United States v. Sinclair*, 983 F.2d 598, 603 (4th Cir.1993). In fact, *Terry* stops customarily involve "detentions where the person detained is not technically free to leave while the officer pursues the investigation." *United States v. Manbeck*, 744 F.2d 360, 376–77 (4th Cir. 1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985); *see Berkemer*, 468 U.S. at 436–37, 104 S.Ct. at 3148–49 (recognizing that traffic stops, which do not require *Miranda* warnings, involve restricting the driver's freedom of action). "Although an individual may be 'seized' within the meaning of the Fourth Amendment when, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,' *Terry* made it clear that a seizure which is limited in its intrusiveness may be reasonable under the Fourth Amendment." *Sinclair*, 983 F.2d at 604 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion)); *see also Berkemer*, 468 U.S. at 439, 104 S.Ct. at 3149. Instead of being distinguished by the absence of any restriction of liberty, *Terry* stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion. *See Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion); *Sinclair*, 983 F.2d at 602. From these standards, we have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or

threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes. *See Moore*, 817 F.2d at 1108 (citing cases); *Manbeck*, 744 F.2d at 377–80.

■ In applying these principles to this case, we conclude that the district court did not commit clear error in determining that Leshuk was not in custody until after the officers discovered the marijuana and informed the defendants that they were under arrest. Leshuk specifically argues that the defendants were in custody because the deputies did not make any effort to "reduce the intensity" of the initial contact, such as by informing the defendants that they could leave or could remain silent. Contrary to Leshuk's contention, however, a stop does not become a custodial interrogation simply because officers do not take such affirmative steps. *Cf. United States v. Wilson*, 895 F.2d 168, 172 (4th Cir.1990) (failure to inform suspect that he may decline search does not make search nonconsensual); *Manbeck*, 744 F.2d at 377 n. 25 (officer's intentions that a suspect was not free to leave or was under arrest do not necessarily transform a *Terry* stop into a custodial arrest); *United States v. Perate*, 719 F.2d 706, 709 (4th Cir.1983) (same).

■ As the above caselaw establishes, a noncustodial *Terry* stop involves a brief detention of liberty; and the officers in this case did not need to "reduce the intensity of the contact" because, as the district court determined, the actions of the deputies and the turkey hunter[3] amounted to a limited *Terry* stop necessary to protect their safety, maintain the status quo, and confirm or dispel their suspicions. The deputies did not draw any weapons. They identified themselves as police officers and informed the defendants that they were investigating a nearby marijuana site. Additionally, the deputies did not exceed the permissible scope of a *Terry* stop after they frisked and began to question the defendants. As the district court found, their conduct during the questioning was neither coercive nor intimidating.

Moreover, their inquiry about the contents of the garbage bag and backpacks was reasonably related to the purpose of the stop, given the fact that the property was located next to the defendants and the fact that wire mesh was attached to the packs. Officers may temporarily detain an individual under *Terry* for purposes of questioning the individual or attempting to obtain his consent to a search when reasonable suspicion exists. *See Berkemer*, 468 U.S. at 439, 104 S.Ct. at 3149 (observing that *Terry* stops typically involve the officer asking "a moderate number of questions to determine [the detainee's] identity and to try to obtain information confirming or dispelling the officer's suspicions"); *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975) (holding that reasonable suspicion of criminal activity warrants temporary seizure in order to question detainees about suspicious circumstances). Furthermore, although, at the beginning of the encounter, the turkey hunter held Leshuk briefly by the arm and instructed the men to raise their hands and call off their dog, these actions, especially without any further display of force, were reasonable precautions for the deputies' protection and safety. *See Sinclair*, 983 F.2d at 602–03. We therefore affirm the district court's refusal to suppress Leshuk's statements made during the questioning.

### B.

■ Concluding that Leshuk's statements were admissible, we now address Leshuk's related argument that the district court erred in denying Leshuk's motion to suppress the items found in the garbage bag and the backpacks. The district court based its denial on its factual finding that Leshuk disclaimed ownership in the property, and we review the district court's factual findings in its suppression determination for clear error. *United States v. Rusher*, 966 F.2d 868, 873 (4th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). The magistrate judge and the district court both

---

**3.** We have assumed that a reasonable person might have believed that the hunter was a law

enforcement official.

found that the evidence from the backpacks and garbage bag should not be suppressed because the defendants had disclaimed ownership of the items. The law is well established that a person who voluntarily abandons property loses any reasonable expectation of privacy in the property and is consequently precluded from seeking to suppress evidence seized from the property. *See Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *United States v. Clark,* 891 F.2d 501, 506 (4th Cir.1989) (per curiam). Although a person does not voluntarily abandon property when the abandonment results from police misconduct, *see United States v. Lara,* 638 F.2d 892, 895 (5th Cir.1981), we concluded above that the defendants' statements were not elicited in violation of *Miranda* principles and resulted from a lawful *Terry* stop.

From this conclusion that the statements were not the result of police misconduct, we turn to consider whether the evidence sufficiently established that Leshuk abandoned any property interest he had in the backpacks and garbage bag. Leshuk specifically argues that the evidence does not demonstrate that he abandoned his property interest because the deputies could not remember exactly what the defendants said when asked about the backpacks and garbage bag. Furthermore, Leshuk emphasizes that Deputy Cuchta testified generally that both defendants denied ownership, but he attempted to recall only what Smith said. In contrast, Deputy Fluharty testified that Smith was silent and that Leshuk expressly denied ownership.

 Despite these contentions, we conclude that the district court did not commit clear error in determining that the deputies' testimony sufficiently established that Leshuk denied ownership in the backpacks and garbage bag. Although Deputy Cuchta could not remember the words Leshuk used

in disclaiming ownership, he testified generally that both defendants denied ownership. Furthermore, although Deputy Fluharty could not recall the exact words Leshuk used, he was adamant that Leshuk denied ownership of the property. During cross-examination, Deputy Fluharty agreed with defense counsel's observation that "[t]he impression that [Leshuk] denied ownership is what is left in your mind; is that correct?" J.A. 142. Because we find that Leshuk abandoned the property, we hold that the deputies did not violate Leshuk's privacy interest protected by the Fourth Amendment by searching the backpacks and garbage bag.[4] Accordingly, we affirm the district court's refusal to suppress the evidence found in the backpacks and garbage bag.

### C.

 Leshuk next argues that the district court lacked subject matter jurisdiction in this case because the federal statute under which he was convicted, Section 401(a)(1) of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 841(a)(1) (the "Drug Act"),[5] is unconstitutional in light of the Supreme Court's recent decision in *United States v. Lopez,* — U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Leshuk contends that the Drug Act is unconstitutional because it regulates intrastate drug activities, such as the marijuana manufacture in this case, which do not substantially affect interstate commerce. *See id.* at ——, 115 S.Ct. at 1630 (holding that a federal statute falls within the scope of Congress' authority under the Commerce Clause if it regulates activity that "substantially affects" interstate commerce).

We have previously upheld the constitutionality of the Drug Act against a Commerce Clause challenge by concluding that Congress has the authority under the Commerce Clause to criminalize the intrastate

---

4. We need not decide whether the evidence sufficiently establishes that Smith denied ownership. He is not a party to this appeal, and Leshuk does not have standing to contest violations of Smith's Fourth Amendment rights. *See United States v. Taylor,* 857 F.2d 210, 214 (4th Cir.1988).

5. Section 401(a)(1) reads:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; ....

21 U.S.C. § 841(a)(1).

possession, distribution, and sale of controlled substances. *United States v. Atkinson*, 513 F.2d 38, 39–40 (4th Cir.1975). *Lopez* does not cause us to alter our view. *See United States v. Gonzalez*, 893 F.Supp. 935 (S.D.Cal. 1995) (reaffirming the constitutionality of the Drug Act after the Supreme Court decided *Lopez*); *United States v. Bramble*, 894 F.Supp. 1384, 1394–96 (D.Haw. 1995) (same); *Cf. Cheffer v. Reno*, 55 F.3d 1517, 1520–21 (11th Cir.1995) (concluding that *Lopez* did not disturb prior judicial determination holding the Freedom of Access to Clinic Entrances Act of 1994, 18 U.S.C. § 248, constitutional). In *Lopez*, the Supreme Court held that Congress exceeded its authority under the Commerce Clause in enacting the Gun–Free School Zones Act, 18 U.S.C. § 922(q) (the "Gun Act"). The Gun Act made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A) (1988 ed., Supp. V). In invalidating the Gun Act, the Court held that the Act "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, —— U.S. at ——–——, 115 S.Ct. at 1630–31. Furthermore, the Court noted that Congress had made no express findings that the prohibited possession substantially affected interstate commerce. The Court reasoned that, although Congress is not obligated to make such findings, they aid the Court in assessing whether the regulated activity substantially affects interstate commerce in cases where the effect is not readily apparent. *Id.* at ——–——–——, 115 S.Ct. at 1631–32.

In contrast to the firearm possession prohibited in the Gun Act, the intrastate drug activities regulated in the Drug Act are clearly tied to interstate commerce. In passing the Drug Act, Congress made detailed findings that intrastate manufacture, distribution, and possession of controlled substances, as a class of activities, "have a substantial and direct effect" upon interstate drug trafficking and that effective control of the interstate problems requires the regulation of both intrastate and interstate activities. *See* 21 U.S.C. § 801 (finding, *inter alia,* that "[i]ncidents of the [drug] traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce"). This Court, as well as other courts, has relied upon these findings in concluding that Congress may regulate intrastate drug activities under the Commerce Clause. *See, e.g., United States v. Visman,* 919 F.2d 1390, 1393 (9th Cir.1990), *cert. denied,* 502 U.S. 969, 112 S.Ct. 442, 116 L.Ed.2d 460 (1991); *Atkinson,* 513 F.2d at 40; *United States v. Scales,* 464 F.2d 371, 375 (6th Cir.1972); *United States v. Lopez,* 459 F.2d 949, 952–53 (5th Cir.), *cert. denied,* 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972). Moreover, contrary to Leshuk's alternative contention, the Drug Act is not unconstitutional as applied if his possession and cultivation were for personal use and did not substantially affect interstate commerce. Although a conviction under the Drug Act does not require the government to show that the specific conduct at issue substantially affected interstate commerce, *see Scales,* 464 F.2d at 373, *Lopez* expressly reaffirmed the principle that "where a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629 (quoting *Maryland v. Wirtz,* 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968)); *see also United States v. Stillo,* 57 F.3d 553, 558 n. 2 (7th Cir.1995); *Scales,* 464 F.2d at 374–76. We thus reject Leshuk's Commerce Clause challenge to the constitutionality of the Drug Act.

## D.

Finally, Leshuk raises other assignments of error contesting the district court's denial of defense counsel's motion to withdraw and the court's calculation of the weight of marijuana used in determining Leshuk's sentence. Having considered the record and the briefs the parties, we find that these assignments of error lack merit.

### III.

For the foregoing reasons, we affirm Leshuk's conviction and sentence.

*AFFIRMED.*