**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOHN W. BAGLEY,
<u>Plaintiff-Appellant,</u>

v.

No. 94-2526

ROBERT W. BOYTE, solely in his
personal capacity; ROBERT BYRD,
solely in his personal capacity,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the District of South Carolina, at Rock Hill.
Joseph F. Anderson, Jr., District Judge.
(CA-94-419-0-17)

Argued: January 29, 1996

Decided: August 16, 1996

Before RUSSELL, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Ernest Eugene Yarborough, YARBOROUGH & CAR-
TER, P.C., Winnsboro, South Carolina, for Appellant. Michael Ste-
phen Pauley, LIDE, MONTGOMERY, POTTS & MEDLOCK, P.C.,
Columbia, South Carolina, for Appellees. **ON BRIEF:** Vinton D.
Lide, LIDE, MONTGOMERY, POTTS & MEDLOCK, P.C., Colum-
bia, South Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

John W. Bagley brought a § 1983 action against two police officers, Robert W. Boyte and Robert Byrd, alleging that they had violated his rights under the Fourth and Fourteenth Amendments by making an unreasonable show of force during an investigatory stop and by retaining his firearms for an unreasonable period of time. Bagley appeals the district court's granting of a directed verdict in favor of the police officers. We affirm.

I.

On December 7, 1993, Deputy Melinda Martin received a call from the manager of the Winnfield West Apartments, an apartment complex that had a history of drug trafficking. The manager expressed concern about a man carrying a briefcase and wearing a handgun in a shoulder holster. The manager provided Deputy Martin with a description of the man's automobile and the car's license plate number. By the time Deputy Martin arrived at the apartment complex to investigate, neither the man nor the vehicle were in sight. Deputy Martin broadcast this information over the police radio and then proceeded to a previously-assigned duty.

Later that same day, Deputy Robert Boyte and two other deputies, responded to a second call from the manager of the apartment complex. The officers observed the car with the license number that the apartment manager had provided, and they radioed a request for the registration and status of the car. The search revealed that the automobile was being operated without insurance coverage, in violation of South Carolina law. Deputy Boyte decided to conduct an investigatory stop.

Earlier that morning, Bagley met Kevin Talbert and Tito Burke, two friends of his, at his residence at Winnfield West Apartments.

2

When Bagley exited his apartment, he carried a case containing two pistols that he had recently purchased. He placed the case in the trunk of Talbert's car, and he departed with his friends to go to a field to test fire the pistols. Talbert drove, Bagley sat in the passenger's seat, and Burke sat in the back. After they finished shooting, Bagley placed the two pistols in the glove compartment of the car, and they returned to the apartment complex around noon. There, some friends of theirs pulled alongside their car, and they all talked from inside their cars. After making plans, Talbert drove out of the apartment complex. Soon after leaving the apartment complex, the car was stopped by the police.

Because the police had evidence that the passengers in the car had weapons, they conducted a felony stop. Two police cars arrived at the scene. Deputy Boyte jumped out of one patrol car and pointed a gun at Bagley. Bagley put his hands up. Another officer ordered Talbert out of the car and placed him in handcuffs. Then, the deputies ordered Bagley to cross over to the passenger's side and exit the vehicle. Once he did, Bagley was ordered to kneel on the gravel pavement, and he was placed in handcuffs. Deputy Boyte took Bagley to his police car. He pulled down Bagley's jacket, revealing an empty shoulder holster. Deputy Boyte then ordered him into the back seat of his car. From there, Bagley watched the police take Tito Burke into custody. The whole incident occurred in broad daylight on a busy street. Many bystanders watched the spectacle.

Eventually, the officers determined that Bagley, Talbert, and Burke were not engaged in criminal activity. Talbert, however, was arrested for driving an uninsured vehicle. Talbert consented to a search of the vehicle, and the officers found the two pistols in the glove compartment. Bagley explained that he owned the pistols, but he was not carrying any written proof of ownership. The deputies impounded the vehicle and took possession of the guns. Deputy Boyte explained that Bagley could claim the guns at the sheriff's office after producing proof of ownership.

Later that day or on the following day, Bagley went to the sheriff's office to reclaim his pistols. He talked with Captain Byrd, who refused to release the weapons until he determined that Bagley was not a convicted felon. Officer Byrd asked Bagley to return on Satur-

3

day, December 11. In the meantime, Officer Byrd ran a search and discovered that Bagley was not a convicted felon. When Bagley returned to the sheriff's office on December 11, he could not enter the building because it was closed for the weekend. Bagley was unaware that he could have reclaimed his pistols if he had gone around back to the operational portion of the sheriff's department. Instead, he returned to the administrative office on Monday, December 13, presented proof of ownership, and retrieved his weapons.

On March 10, 1994, Bagley filed this § 1983 action against Deputy Boyte and Captain Byrd, claiming that they had violated his Fourth and Fourteenth Amendment rights. After discovery, the case came before the district court for trial on November 1, 1994. At the conclusion of Bagley's case, the defendants moved for a directed verdict. After an extensive hearing on the motion, the district court granted the motion and dismissed the case. Bagley now appeals.

II.

We review de novo the grant of a motion for a directed verdict. Gairola v. Virginia Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985). In considering a motion for a directed verdict, the district court must construe the evidence in the light most favorable to the non-moving party. Garraghty v. Jordan, 830 F.2d 1295, 1302 (4th Cir. 1987). The district court must direct a verdict if, without weighing the evidence or considering the credibility of the witnesses, it finds that a reasonable jury could reach but one conclusion. Gairola, 753 F.2d at 1285.

A.

We first consider Bagley's claim that the police officers made an excessive show of force during their stop of Talbert's vehicle.

A claim that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free person is analyzed under the Fourth Amendment standard of reasonableness. Graham v. Connor, 490 U.S. 386, 395 (1989). As the Supreme Court has explained:

4

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

Id. at 396-97 (internal quotes omitted).

The police had a right to conduct an investigatory stop of Talbert's vehicle because they knew that Talbert was operating an uninsured vehicle, a crime under South Carolina law. See United States v. Cortez, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). We have long recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. As a general rule, officers conducting an investigatory stop are authorized to take such steps as are reasonable necessary to protect their personal safety and to maintain the status quo during the course of the stop. United States v. Leshuk, 65 F.3d 1105, 1109 (4th Cir. 1995) (citing United States v. Hensley, 469 U.S. 221, 235 (1985)).

From the apartment manager's tips, the deputies had reason to believe that one of the passengers of the vehicle was carrying a gun in a shoulder holster. For their own safety, the deputies had good reason to draw weapons on the vehicle, get the passengers out of the car, and pat them down for weapons. Once assured that the passengers did not pose a threat, the deputies could safely investigate the insurance status of the vehicle.

The deputies also had the authority to use handcuffs and to place Bagley in the police car. We have held that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force" is not necessarily inconsistent with

the parameters of an investigatory stop. Id. at 1109-10. As the Seventh Circuit has stated:

> In the recent past, the "permissible reasons for a stop and search and the permissible scope of the intrusion[under the Terry doctrine] have expanded beyond their original contours. . . ." The last decade "has witnessed a multifaceted expansion of Terry," including the "trend granting officers greater latitude in using force in order to `neutralize' potentially dangerous suspects during an investigatory detention . . . ." For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention.

United States v. Tilmon, 19 F.3d 1221, 1224-25 (7th Cir. 1994).

Once Deputy Boyte removed Bagley from the car and frisked him, he discovered that Bagley, although wearing a shoulder holster, did not possess a weapon on him. Nonetheless, Deputy Boyte had reason to believe that a weapon might be in Talbert's car. If Bagley had not been restrained during the deputies' investigation, he could have had the opportunity to lunge for a weapon inside the car. Thus, handcuffing Bagley and placing him in the back of the patrol car fell within the contours of an investigatory stop.

We recognize that it must have been extremely frightening for Bagley to have a police officer draw a weapon on him, order him to the ground, and handcuff him. It must also have been embarrassing for these events to transpire in broad daylight in front of many spectators. Nevertheless, we cannot conclude that Deputy Boyte acted unreasonably in taking these precautionary steps to protect his safety during the investigatory stop of Talbert's vehicle. We therefore conclude that Deputy Boyte's actions did not amount to an excessive show of force.*

_____
*Even if we held that Deputy Boyte had acted unreasonably, he would still be protected by qualified immunity. A police officer is immune from

6

B.

We next turn to Bagley's claim that the officers' seizure of his firearms violated his right to due process under the Fourteenth Amendment.

The Due Process Clause of the Fourteenth Amendment provides that "[no State shall] deprive a person of life, liberty, or property, without due process of law . . . ." In the normal case, due process requires the state to provide notice and an opportunity for a hearing before it deprives the person of life, liberty, or property. See Parratt v. Taylor, 451 U.S. 527, 537-38 (1981), overruled in part not relevant here, Daniels v. Williams, 474 U.S. 327, 330-31 (1986). In certain circumstances, however, the requirements of due process may be satisfied by the provision of a post-deprivation remedy. Id. at 538. The Supreme Court has recognized that "either the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." Id. at 539.

In the instant case, the circumstances required Deputy Boyte to take Bagley's firearms without any predeprivation process. Deputy Boyte found the firearms in the glove compartment of a car being operated without insurance. Although Bagley claimed to be the owner of the firearms, he was not carrying written documentation proving his ownership. Furthermore, because the deputies impounded Talbert's car, Bagley was forced to return to his residence by foot; it would have been irresponsible for Deputy Boyte to permit Bagley to walk home while carrying those weapons.

_____

liability unless his actions violated clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Bagley would not be able to show that the officers' actions exceeded the clearly established bounds of reasonable police conduct. Nonetheless, we need not reach the qualified immunity issue because we hold that Deputy Boyte did not violate Bagley's constitutional rights.

7

The police provided Bagley with a post-deprivation remedy. Deputy Boyte informed Bagley that he could reclaim his firearms by returning to the sheriff's office and presenting proof of ownership. At the sheriff's office, Officer Byrd required Bagley to allow the police an opportunity to determine whether Bagley was a felon in possession of a firearm. Once the police determined that Bagley was the owner and that he was not a felon, they returned the firearms to Bagley.

Bagley argues that the seizing of his property violated his right to substantive due process. A violation of substantive due process occurs only when the conduct of the state actor "shocks the conscience." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 719 (4th Cir. 1991) (citing Rochin v. California, 342 U.S. 165, 172 (1952)), cert. denied, 502 U.S. 1095 (1992). In other words, the protections of substantive due process extend "only to state action so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." Rucker v. Harford County, Md., 946 F.2d 278, 281 (4th Cir. 1991), cert. denied, 502 U.S. 1097 (1992).

The actions of Deputy Boyte and Captain Byrd in the instant case do not shock the conscience. Deputy Boyte found the firearms in an uninsured vehicle that did not belong to Bagley. Before giving the firearms to Bagley, he needed to assure himself that Bagley was the true owner of the weapons. When Bagley produced proof of ownership at the sheriff's office, Officer Byrd retained Bagley's property for a few extra days until he determined that Bagley was not a felon. It is unfortunate that it took six days to straighten out the matter, but the officers did not violate Bagley's substantive due process rights by holding the guns until they determined that Bagley was the owner and that he was not a felon.

III.

For the foregoing reasons, we affirm the district court entry of a directed verdict in favor of the defendants.

AFFIRMED

8