**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.                                                          No. 96-4876

TONY LEONG,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Williams Jr., District Judge.
(CR-96-272)

Argued: May 5, 1997

Decided: June 26, 1997

Before WILKINS, Circuit Judge,
Joseph F. ANDERSON, Jr., United States District Judge for the
District of South Carolina, sitting by designation,
and TRAXLER, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Hollis Raphael Weisman, Assistant United States Attor-
ney, Hyattsville, Maryland, for Appellant. John Chamble, Assistant
Federal Public Defender, Greenbelt, Maryland, for Appellee. **ON
BRIEF:** Lynne A. Battaglia, United States Attorney, Hyattsville,

Maryland, for Appellant. James K. Bredar, Federal Public Defender, Lauren E. Case, Staff Attorney, Greenbelt, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellee Tony Leong ("Leong") was indicted for being a felon in possession of a firearm in violation of 18 U.S.C.A.§ 922(g) (West Supp. 1997). Prior to trial, Leong moved to suppress his statement admitting ownership of the firearm on the ground that the statement had been made in violation of Miranda v. Arizona , 384 U.S. 436 (1966). The district court granted the motion to suppress and the Government appealed pursuant to 18 U.S.C.A. § 3731 (West 1985). We affirm.

I.

On June 1, 1996 at approximately 3:00 a.m., United States Park Police Officer Matthew Nichols ("Nichols") observed a vehicle speeding on Maryland Route 197, a two-lane highway just off the Baltimore-Washington Parkway. Nichols activated his emergency equipment and the vehicle pulled to the side of the road. According to Nichols, the area where the stop occurred was dark, heavily wooded, and fairly isolated. Once the vehicle was stopped, Nichols approached it, asked the driver for his license and registration, and issued the driver a warning citation for speeding. While speaking with the driver, Nichols noticed an odor of alcohol coming from inside the vehicle, which contained three additional passengers, including Leong. Nichols asked the driver if he had consumed any alcohol and whether alcohol was in the vehicle. The driver denied both inquiries, but stated that some of his passengers may have been drinking alcohol earlier. Upon further questioning, Nichols determined that the driver and all passengers were under 21 years of age.

2

Nichols asked if he could search the vehicle and the driver consented. The driver and all passengers then exited the vehicle and walked to its rear at Nichols' request. During the ensuing search, Nichols discovered a handgun in a plastic holster on the floor behind the driver's seat. According to Nichols' testimony, no one was free to leave the scene once he found the firearm. Nichols retrieved the firearm, walked to the rear of the vehicle, and ordered all four individuals to squat and put their hands above their heads. Nichols then asked Leong and his companions who owned the firearm, but no one answered. After a few moments, the driver became somewhat distraught and also asked the others who owned the firearm. When no one responded, Nichols testified, he advised Leong and the others that they were "all going to be placed under arrest" until he could determine who owned the firearm. Although he did not read them their Miranda rights, Nichols testified he again asked who owned the firearm, at which point Leong confessed his ownership.

On July 15, 1996, the grand jury for the District of Maryland returned an indictment charging Leong with being a felon in possession of a firearm. See 18 U.S.C.A. § 922(g) (West Supp. 1997). Leong filed a motion to suppress his statement admitting ownership of the firearm found in the vehicle. According to Leong, suppression of the statement was required because the statement was made after he was in custody, in response to interrogation by Nichols, but without his having been given the benefit of Miranda warnings. Conversely, the Government asserted Leong was not in custody at the time he made the statement and, therefore, Miranda warnings were not required. At the suppression hearing, Nichols was the only witness called to testify. The district court ruled that Leong was in custody and suppressed the statement. The Government appealed.

II.

It is well established that persons subjected to custodial interrogation are entitled to the procedural safeguards prescribed by Miranda v. Arizona, 384 U.S. 436 (1966). See Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam). In Miranda , the Supreme Court afforded protection to the Fifth Amendment privilege against compelled self-incrimination "from the coercive pressures that can be brought to bear upon a suspect in the context of custodial interroga-

3

tion." Berkemer v. McCarty, 468 U.S. 420, 428 (1984). The Miranda Court held that a suspect interrogated while in police custody "`must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" Id. at 429 (quoting Miranda, 384 U.S. at 444). Statements made by a suspect during custodial interrogation are inadmissible as evidence of guilt unless prior Miranda warnings were given. See Stansbury, 511 U.S. at 322; Berkemer, 468 U.S. at 429; United States v. Leshuk, 65 F.3d 1105, 1108 (4th Cir. 1995).

> The purposes of the safeguards prescribed by Miranda are to ensure that the police do not coerce or trick captive suspects into confessing, to relieve the inherently compelling pressures generated by the custodial setting itself, which work to undermine the individual's will to resist, and as much as possible to free courts from the task of scrutinizing individual cases to try to determine, after the fact, whether particular confessions were voluntary.

Berkemer, 468 U.S. at 433 (internal quotation marks & footnotes omitted).

For purposes of Miranda, custodial interrogation is defined as "`questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Berkemer, 468 U.S. at 428 (quoting Miranda, 384 U.S. at 444). A person is "in custody" if he "has been formally arrested or if he is questioned under circumstances in which his freedom of action is curtailed `of the degree associated with a formal arrest.'" Leshuk, 65 F.3d at 1108 (quoting Stansbury, 511 U.S. at 322).

To determine if a suspect was "in custody" at the time of law enforcement questioning, "[t]wo discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 116 S. Ct. 457, 465 (1995) (footnote omitted). The first inquiry is a factual one and is

4

reviewed for clear error. Id.; Leshuk , 65 F.3d at 1110. The latter inquiry "calls for application of the controlling legal standard to the historical facts. This ultimate determination . . . presents a mixed question of law and fact qualifying for independent review." Thompson, 116 S. Ct. at 465 (internal quotation marks omitted). The Government does not challenge the district court's factual findings; therefore, the only question before the court is one of law subject to de novo review. It is undisputed that Miranda warnings were not given to Leong until after he admitted his ownership of the firearm and that the statement was made in response to the interrogation by Nichols. Thus, the issue for review is whether Leong was "in custody" for purposes of Miranda; if so, his admission was properly suppressed by the district court.

A.

In Berkemer v. McCarty, the Supreme Court considered "whether the roadside questioning of a motorist detained pursuant to a routine traffic stop should be considered `custodial interrogation'" for purposes of Miranda. Berkemer, 468 U.S. at 435. Although such a stop "significantly curtails the `freedom of action' of the driver and the passengers," id. at 436, the Court held that "persons temporarily detained pursuant to [ordinary traffic] stops are not `in custody' for the purposes of Miranda" due to the "noncoercive" nature of such stops, id. at 440.

Specifically, the Court found two characteristics of routine traffic stops that "mitigate the danger that a person questioned will be induced `to speak where he would not otherwise do so freely.'" Id., 468 U.S. at 437 (quoting Miranda, 384 U.S. at 467). First, unlike a station house interrogation, the detentions are"presumptively tempo-rary and brief." Id., 468 U.S. at 437. Second, such detentions share the characteristics of occurring in public and of being less police dominated, reducing the potential that police will use improper meth-ods to elicit self-incriminating statements and diminishing the sus-pect's fear that lack of cooperation will be met with abuse. See id. at 438-39. Such detentions, the Court held, are similar to investigative stops pursuant to Terry v. Ohio, 392 U.S. 1 (1968). Berkemer, 468 U.S. at 439. "`[T]he person detained is not technically free to leave while the officer pursues the investigation,'" but "Terry stops differ

5

from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion." Leshuk, 65 F.3d at 1109 (quoting United States v. Manbeck, 744 F.2d 360, 376-77 (4th Cir. 1984)).

The Berkemer Court, however, refused to adopt a bright-line rule that Miranda warnings are never required during Terry stops or routine traffic stops. On the contrary, the Court specifically noted that "the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a `degree associated with formal arrest,'" and "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him `in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." Berkemer, 468 U.S. at 440 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323. Thus, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was `in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer, 468 U.S. at 442. If, however, an officer's views or beliefs are manifested to the suspect under interrogation and would have affected how a reasonable man would have understood his situation, they become factors to consider. See Stansbury, 511 U.S. at 325; Berkemer, 468 U.S. at 441-42. Thus, in Berkemer, the Supreme Court determined that the suspect was not in custody during the short period of time between his detention and arrest in part because the suspect was not informed that his detention would be other than temporary. Berkemer, 468 U.S. at 441-42.

B.

Whether the investigative stop had evolved into a custodial interrogation when Leong confessed depends upon whether all the facts and circumstances would have led a reasonable person to believe that the detention was not temporary and that he would not soon be free to

6

leave. See Thompson, 116 S.Ct. at 465; Berkemer, 468 U.S. at 437-42. We agree with the district court that this routine traffic stop evolved into custodial interrogation when Leong was subjected to questioning by Nichols after being told that he and the others were going to be placed under arrest until Nichols found out who owned the firearm. Under these circumstances, a reasonable person would believe that leaving was not and would not become an option and, on the contrary, that he was in custody. Since Leong was in custody for purposes of Miranda at the time he was questioned and because he was not given the proper Miranda warnings, his statement admitting ownership of the firearm was properly suppressed by the district court.

III.

For the foregoing reasons, and under the narrow facts presented by this case, we affirm the decision of the district court suppressing the statement made by Leong.

AFFIRMED

7