**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 04-4654

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JAMES HAMPTON WILLIAMS, II,

Defendant - Appellant.

Appeal from the United States District Court for the District of South Carolina, at Columbia.  Cameron McGowan Currie, District Judge.  (CR-02-548)

Argued:  March 15, 2007              Decided:  May 16, 2007

Before WILLIAMS, MICHAEL, and SHEDD, Circuit Judges.

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

**ARGUED:** Leland Bland Greeley, Rock Hill, South Carolina, for Appellant.  Jane Barrett Taylor, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.  **ON BRIEF:** Reginald I. Lloyd, United States Attorney, Columbia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

James Hampton Williams II (Williams) was convicted in a jury trial on several counts related to his participation in a conspiracy to distribute cocaine and cocaine base. The district court sentenced Williams to life in prison. Williams appeals both his conviction and his sentence. We conclude that the district court improperly denied Williams's motion to suppress certain self-incriminating statements made in the absence of Miranda warnings. Because the error was harmless, however, we affirm Williams's conviction. No similar Fifth Amendment violation tainted the authentication of audio recordings featuring Williams's voice, and the district court properly admitted the recordings into evidence. In light of the district court's application of the sentencing guidelines in a mandatory fashion, we vacate Williams's sentence and remand for resentencing under United States v. Booker, 543 U.S. 220 (2005).

I.

The events leading to Williams's prosecution began in 2001. As part of an ongoing investigation, an undercover agent, James Abraham, met Jonathan Stroman for the purpose of obtaining significant quantities of cocaine. Later, Stroman and Abraham arranged to buy one-half kilogram of cocaine from Hubert Hampton "Corey" Williams (Corey), a large-scale cocaine dealer and Williams's brother. On June 1, 2001, immediately prior to the

transaction, Corey advised Stroman and Abraham that Williams would deliver the cocaine. Williams met Abraham and Stroman in the parking lot of a South Carolina Waffle House and gave them one-half kilogram of cocaine in exchange for $12,500. In late June Abraham and Stroman bought an additional kilogram of cocaine from Corey.

The government subsequently sought and obtained an order authorizing the interception of communications occurring over Corey's cell phone. Corey disposed of the tapped phone on August 22, 2001. On August 31 the government sought and obtained an order for a wiretap on Corey's replacement cell phone, but that phone was also quickly abandoned. On September 5, 2001, both wiretaps ended. On September 20, 2001, Abraham and Stroman again met with Corey to buy a kilogram of cocaine. After a few months' hiatus, the investigation resumed in March 2002. The government obtained an order for a wiretap on a third cell phone belonging to Corey.

During each of the wiretaps agents intercepted calls between Williams and Corey. In May 2002 the agents overheard conversations about Corey's planned trip to Atlanta to meet with Williams. Corey was to exchange $59,000 for three kilograms of cocaine. Later, agents overheard that Corey had delivered the money and was on his way back from Atlanta. The agents intercepted him near Columbia, South Carolina, and transported him to a nearby FBI office where he was offered the opportunity to cooperate.

3

Corey consulted counsel and agreed to cooperate. His cooperation included an agreement to record his conversations.

Corey subsequently placed calls to Williams to inquire about the three kilograms of cocaine that Williams was supposed to deliver to him. Williams later called Corey to tell him that he had received the cocaine from their uncle, John Williams. When Williams delivered the cocaine to Corey, agents observed the transaction.

On June 24, 2002, Williams arrived in Columbia to pick up a motorcycle that Corey had bought for him. FBI Agent Michael Stansbury and several other officers observed Williams in his vehicle and stopped him. Agent Stansbury handcuffed Williams, but told him he was not under arrest. The agents placed Williams in a transport belt and took him to a nearby FBI office. At the office the agents again told him he was not under arrest. They proceeded to outline the evidence they had against him and offered him the opportunity to cooperate. At no point did the agents advise Williams of his Miranda rights. Williams agreed to cooperate. Although Agent Stansbury told him not to say anything at that time, Williams volunteered information about some of the things he could and could not do to help with the investigation. When Williams said he could not get in touch with his uncle John, the leader of the conspiracy, Agent Stansbury asked clarifying questions, such as "'Why can't you do that. I don't understand,' . . . 'How did you

4

meet him then?' . . . [or] 'Why did you do that.'"  J.A. 91-92.

Williams's responses to these questions indicated his involvement with his uncle and other members of the conspiracy.  When Williams finished speaking, he was permitted to leave.  He subsequently fled to Mexico where he hid until May 2003, when he was arrested for conspiracy to distribute cocaine and crack cocaine, money laundering, and other charges.

Before his trial began Williams moved to suppress self-incriminating statements made during his June 2002 detention.  He claimed that the agents violated his Fifth Amendment rights by engaging in custodial interrogation without giving him Miranda warnings.  The district court denied the motion because it found that Williams's statements were not the result of interrogation by the FBI.  The jury delivered a guilty verdict on all counts.

The Presentence Report (PSR) recommended a sentence of life in prison based on the amount of cocaine involved in the conspiracy (in excess of 150 kilograms) and enhancements for possession of a dangerous weapon, role in the offense, and obstruction of justice.  Williams successfully objected to the obstruction of justice enhancement.  The court rejected his objection, under Blakely v. Washington, 542 U.S. 296 (2004), that his sentence was enhanced by facts not found by the jury.  The court sentenced Williams to life in prison, and he appeals.

5

II.

In his first challenge to his conviction, Williams argues that the district court should have suppressed the self-incriminating statements made during the June 2002 detention because they were procured by a violation of his Fourth Amendment rights. Williams did not present this argument to the district court, so we review for plain error. United States v. Olano, 507 U.S. 725, 731-32 (1993).

An officer may stop and briefly detain a person for investigative purposes when the officer has a "reasonable suspicion" of criminal activity. United States v. Hensley, 469 U.S. 221, 229 (1985). Further detention is permitted when supported by probable cause. See New York v. Harris, 495 U.S. 14, 18-19 (1990). The agents in this case had accumulated sufficient evidence of Williams's involvement in the drug conspiracy to have probable cause for suspecting his involvement in a drug crime. Agents had overheard calls between Corey and Williams discussing drug transactions, and an undercover agent had previously bought drugs from Williams in a controlled transaction. Although the agents opted not to arrest him, Williams's detention was supported by probable cause and was not overly lengthy. Thus, his detention did not violate the Fourth Amendment, and his statements need not be suppressed as products of an unlawful seizure.

III.

Williams also argues that his incriminating statements should have been suppressed because the agents failed to advise him of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), before engaging in custodial interrogation. We review the legal conclusions underlying the district court's suppression determination de novo and its factual findings for clear error. <u>United States v. Rusher</u>, 966 F.2d 868, 873 (4th Cir. 1992).

A person subjected to custodial interrogation is entitled to the procedural safeguards prescribed by <u>Miranda</u> as protection against compulsory self-incrimination. 384 U.S. at 444. Statements made by a defendant who has not received <u>Miranda</u> warnings are inadmissible in the prosecution's case in chief. <u>Id.</u> In the absence of a formal arrest, a suspect is "in custody" for <u>Miranda</u> purposes if his freedom of action is curtailed to a degree similar to a formal arrest. <u>United States v. Leshuk</u>, 65 F.3d 1105, 1108 (4th Cir. 1995). The district court's finding that Williams was in custody was not clearly erroneous. Although Williams was told he was not under arrest, he was also not free to leave. The agents handcuffed him, placed him in a transport belt, took him to FBI headquarters, and detained him for one to two hours. These facts support a conclusion that Williams was in custody for purposes of <u>Miranda</u>.

The district court also correctly found that Williams never received Miranda warnings while he was in custody. The government does not make any claim to the contrary. Thus, the central issue is whether Williams was interrogated while in custody. Interrogation occurs when police engage in "express questioning" or use words or actions that they "should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980). When Williams arrived at FBI headquarters, the agents played several tapes of conversations between him and Corey. The agents also told Williams that, although he was not currently under arrest, he would eventually be indicted. They then offered him a chance to cooperate. Williams agreed and began to explain how he could and could not help with the investigation of the conspiracy. Agent Stansbury told Williams not to say anything, but, contrary to his own instruction, he encouraged Williams to elaborate on certain points by asking questions. When Williams said he could not telephone his uncle, John Williams, the man authorities regarded as the leader of the conspiracy, Agent Stansbury asked why he could not do that and prodded Williams to explain how he was able to arrange meetings with John Williams. Williams explained that a woman who was John Williams's wife or girlfriend would contact Williams and tell him where to meet John Williams. Williams also said that John Williams's sister knew how to get in touch with John

8

Williams. Williams's responses to Agent Stansbury's questions linked him to John Williams and showed his knowledge of how communications in the conspiracy operated. Agent Stansbury should have known that any response to his questions would likely implicate Williams in the drug conspiracy. His questioning thus constituted custodial interrogation without Miranda warnings. Williams's statements should have been suppressed.

We conclude that the district court erred in denying Williams's motion to suppress. This error, however, was harmless in light of the substantial evidence against Williams that is unconnected to the statements. A federal constitutional error may be declared harmless if it was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967). We must ask "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Id. (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963). In this case, an average jury "would not have found the [government's] case significantly less persuasive had the [disputed testimony] been excluded." See Schneble v. Florida, 405 U.S. 427, 432 (1972). Williams had personally engaged in drug transactions with an undercover FBI agent, and the wiretaps on Corey's phone picked up many calls between Williams and Corey concerning drug transactions. In at least one of these calls, Williams revealed his connection to John Williams by telling Corey that he had received a three-

kilogram shipment of cocaine from John and would deliver it to Corey. Agents confirmed the delivery by physical observation. The incriminating statements, which provided further evidence of a link to John Williams and another co-conspirator, were thus unnecessary to the conviction.

IV.

Williams contests the admissibility of the recordings of his calls with Corey. He argues that the recordings cannot be authenticated without the testimony of Agent Stansbury, whose ability to identify his voice derives from a violation of his Fifth Amendment rights. A district court's admission of audio recordings is reviewed for abuse of discretion. United States v. Wilson, 115 F.3d 1185, 1188 (4th Cir. 1997).

A voice in an audio recording may be identified by opinion evidence "based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Fed. R. Evid. 901(b)(5). This includes knowledge of a voice that derives from statements made without Miranda warnings. The Fifth Amendment does not protect the sound of a person's voice because such physical characteristics are not testimonial in nature. United States v. Dionisio, 410 U.S. 1, 7 (1973). Agent Stansbury's prior exposure to Williams's voice during the meeting when no Miranda warnings were given could thus serve as a valid foundation for his

10

identification of Williams's voice in the recordings.  The district court did not abuse its discretion by admitting into evidence properly authenticated recordings.

V.

Williams's final argument concerns whether the sentence imposed by the district court violated <u>Booker</u>.  A court commits Sixth Amendment error when, under a pre-<u>Booker</u> mandatory guidelines regime, it engages in judicial factfinding resulting in a sentence that exceeds the maximum guideline sentence authorized by the jury verdict.  <u>United States v. Robinson</u>, 460 F.3d 550, 558 (4th Cir. 2006).  Such an error is presumed to affect a defendant's substantial rights unless the government demonstrates that the court would have imposed the same sentence in the error's absence. <u>Id.</u>

The government concedes that the district court committed <u>Booker</u> error by enhancing Williams's sentence based upon facts not found by the jury and by applying the sentencing guidelines in a mandatory fashion.  This warrants remand for resentencing in accordance with the advisory nature of the guidelines.  On remand, the district court must calculate the guideline range (making all appropriate factual findings) and impose a reasonable sentence after considering other relevant factors in the guidelines and in

11

18 U.S.C. § 3553(a).  <u>United States v. Hughes</u>, 401 F.3d 540, 546 (4th Cir. 2005).

VI.

In sum, we affirm Williams's conviction because the failure to suppress his self-incriminating statements was harmless and the audio recordings were properly admitted.  We must, however, vacate Williams's sentence and remand for resentencing due to the district court's treatment of the sentencing guidelines as mandatory.

<u>AFFIRMED IN PART</u>,<br/><u>VACATED IN PART</u>,<br/><u>AND REMANDED</u>