# CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

v.

Joseph McKinney

August 31, 2015

Case No. (Criminal) CR15-1731

By Judge David W. Lannetti

Today, the Court rules on the motion filed by Defendant Joseph McKinney, seeking to suppress evidence resulting from a traffic stop where, after the other occupants of the stopped vehicle fled the scene, McKinney, while at gunpoint, remained in the vehicle and admitted to having a firearm (the "Motion To Suppress"). This admission resulted in a charge against McKinney of possession of a firearm by a convicted felon. The issues before the Court are: (1) whether the Officer possessed reasonable, articulable suspicion to conduct an investigative detention of McKinney; (2) whether the Officer's actions between observing and questioning McKinney constituted investigative detention or custodial arrest; (3) whether the Officer's questioning of McKinney regarding the presence of weapons, under the conditions present, amounted to custodial interrogation such that *Miranda* warnings were required; and (4) whether McKinney's statement regarding his possession of a weapon was voluntary. The Court finds as follows: there was reasonable, articulable suspicion to conduct an investigative detention of McKinney; the Officer's actions during the brief

period of time between observing and questioning McKinney constituted an investigative detention; the Officer's questioning of McKinney regarding the presence of weapons, under the conditions present, did not amount to custodial interrogation and, even if they did, a *Miranda* warning was not required; and McKinney's statement was voluntary. The Court, therefore, denies the Motion To Suppress.

## Background

McKinney was the front-seat passenger in an automobile that Norfolk Police Officer C. Chaney (the "Officer") and his partner stopped on June 3, 2015. (Tr. 7.) The Officer observed the vehicle at the intersection of Berkley Avenue and Campostella Road in the City of Norfolk, near its border with the City of Chesapeake, and noticed that the vehicle's license plate registration sticker was partially obscured. (*Id.*) The Officer activated his lights and siren to signal the vehicle to stop. (*Id.* at 7-8.) The vehicle crossed into Chesapeake and made a "couple of turns" over the course of approximately one quarter mile before stopping in a "driveway at an apartment complex." (*Id.* at 8, 12.) The driver of the vehicle and a backseat passenger immediately exited the vehicle and fled on foot, resulting in the vehicle rolling backwards into the patrol car. (*Id.* at 8-9.) The Officer's partner exited the patrol car and made chase on foot. (*Id.*)

The Officer began to follow his partner and then looked back at the vehicle, whereupon he noticed McKinney in the front passenger seat. (*Id.* at 9.) The Officer drew his service weapon and pointed it at McKinney, commanded McKinney to "put his hands where [he] could see them," and approached McKinney from the passenger side of the vehicle. (*Id.* at 9, 15-16.) The Officer then opened the vehicle door and asked McKinney "if there was anything in the car that [the Officer] needed to know about, any weapons." (Tr. 9.) The Officer testified that this "is something I ask at traffic stops all the time" and that "given this being a pursuit, I really felt the need to ask that question." (Tr. 19.) McKinney informed the Officer that he had "a gun on [his] right hip." (*Id.* at 16.) The Officer instructed McKinney to exit the vehicle and put his hands on the car, whereupon the Officer holstered his service weapon, handcuffed McKinney, and located a firearm under McKinney's shirt. (*Id.* at 16-17.) At all times during the interaction, McKinney was compliant with the Officer's orders. (*Id.* at 17.)

McKinney subsequently filed the Motion To Suppress that is the subject of this Opinion. The parties were before the Court for a hearing on the motion on August 4, 2015. The Court granted leave for the parties to file post-hearing briefs on the issue.

*Positions of the Parties*

## A. *Defendant's Motion To Suppress*

During the hearing and/or in his post-hearing brief in support of his Motion To Suppress, McKinney advances several arguments.

The Motion To Suppress itself is based solely on an allegation of "unlawful questioning, seizure and search of the Defendant on June 3, 2015," and no supporting brief was filed prior to the hearing. Of note, such a motion to suppress falls short of the specificity required by Rule V.C of the *Norfolk Circuit Court Criminal Case Procedures*, which requires that, in a motion to suppress, "the evidence sought to be suppressed and the grounds for suppression shall be *specifically* stated."

McKinney argues that, although the Officer may have had the right to ask McKinney to exit the vehicle and identify himself based on the traffic stop for an obscured registration sticker, the Officer did not have the right to question McKinney about the presence of firearms or to search McKinney. McKinney also claims that the Officer's seizure of McKinney extended beyond the brief and limited stop permitted by *Terry v. Ohio.* McKinney further asserts that, by pointing his gun at McKinney and demanding that he answer a question regarding whether he had any weapons, the Officer interrogated McKinney as part of a custodial arrest without informing him of his *Miranda* rights. McKinney further contends that the questioning violated his "U.S. Constitutional right to remain silent under the 5th Amendment," as the statement sought to be suppressed was made involuntarily and was coerced through the threat of violence, "a weapon, pointed at his face, that had the ability to potentially end his life." (McKinney Br. in Supp. of Mot. To Suppress 3-4.)

## B. *Commonwealth's Response*

At the hearing and in its post-hearing brief in opposition to the Motion To Suppress,[1] the Commonwealth argues that McKinney initially was legally detained during a routine traffic stop based on an obscured registration sticker and that the detention escalated as a result of other parties' actions. The Commonwealth maintains that the Officer's actions of pointing his weapon and asking McKinney whether there were any weapons in the vehicle were appropriate under the circumstances of an investigative detention and that, even if the Court were to find that the Officer's actions elevated the investigative detention to a custodial arrest, the circumstances are such that the Officer's actions come within the public and officer safety exceptions to *Miranda.*

---

[1] The Commonwealth did not file a responsive brief to *McKinney*'s Motion To Suppress prior to the hearing.

■■■■■■■

*Analysis*

A. *Legal Standard*

Pursuant to the exclusionary rule, evidence must be suppressed if it is seized by the government in violation of the Fourth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). A court shall exclude evidence that was obtained (1) as a direct result of an illegal search and seizure or (2) as a proximate result of an illegal search and seizure. *Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963).

Conducting an investigative stop of an automobile is a seizure for Fourth Amendment purposes. *Jackson v. Commonwealth*, 267 Va. 666, 672, 594 S.E.2d 595, 598 (2004) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). An officer need only have reasonable, articulable suspicion to "detain a person for the purpose of investigating possibly criminal behavior," and such a stop is valid "even though there is no probable cause to make an arrest." *Whitfield v. Commonwealth*, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003) (citing *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). The stopping officer's reasonable suspicion needs to be "based on objective facts, that the individual is involved in criminal activity." *Id.* (citing *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

The U.S. Supreme Court has held that, during a traffic stop, "a police officer effectively seizes 'everyone in the vehicle,' the driver and all passengers." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)). Accordingly, the Court opined that "in a traffic-stop setting . . . a lawful investigatory stop . . . is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity." *Id.*

During an investigative detention, police officers may make reasonable inquiries into matters unrelated to the stop without converting the stop into an unlawful seizure as long as the questioning does not measurably extend the length of the stop. *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005). The U.S. Supreme Court recently clarified that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). The Court held that "an officer's mission includes 'ordinary inquiries incident to [the traffic] stop'" (*e.g.*, checking the driver's license, determining if the driver has outstanding warrants, inspecting the vehicle's registration and proof of insurance) and that the "officer safety interest stems from the mission of the stop itself." *Id.* at 1615-16 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). Had the driver not fled the scene, the officers undoubtedly would have realized that

the vehicle was stolen when they checked the vehicle registration, as they became aware of this fact soon after they took McKinney into custody. (Tr. 10.) This discovery would have elevated the level of suspicion of criminal activity.

The Commonwealth bears the burden of proving that an investigative traffic stop is lawful, and "[i]n determining whether an 'articulable and reasonable suspicion' justifying an investigatory stop of a vehicle exists, courts must consider 'the totality of the circumstances – the whole picture'." *Logan v. Commonwealth*, 19 Va. App. 437, 441, 452 S.E.2d 364, 367 (1994) (quoting *Murphy v. Commonwealth*, 9 Va. App. 139, 144, 384 S.E.2d 125, 127 (1989)).

"Whether a suspect is 'in custody' under *Miranda* is determined by the circumstances of each case, and the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." *Harris v. Commonwealth*, 27 Va. App. 554, 564, 500 S.E.2d 257, 262 (1998) (quoting *California v. Behler*, 463 U.S. 1121, 1125 (1983)). "*Terry* stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion." *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995).

When responding to a motion to suppress, the Commonwealth has the burden to prove admissibility of the seized evidence by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Police actions are tested using an objective reasonableness standard without regard to the underlying intent or motivation of the officers involved. *Poindexter v. Commonwealth*, 16 Va. App. 730, 734, 432 S.E.2d 527, 529-30 (1993).

To satisfy the Due Process clause of the Fourteenth Amendment, the Commonwealth must prove by a preponderance of the evidence that a confession is freely and voluntarily made. *Bottenfield v. Commonwealth*, 25 Va. App. 316, 323, 487 S.E.2d 883, 886 (1997). The test of voluntariness is whether the statement is the product of an "essentially free and unconstrained choice" by the person making it or the speaker's will has been "overborne and his capacity for self-determination critically impaired." *Midkiff v. Commonwealth*, 250 Va. 262, 268, 462 S.E.2d 112, 116 (1995) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)) (internal quotation marks omitted). Coercive police activity "is a necessary predicate to the finding that a confession is not 'voluntary'." *Washington v. Commonwealth*, 43 Va. App. 291, 303 597 S.E.2d 256, 262 (2004) (quoting *Colorado v. Connelly*, 479 U.S. 157 (1986)) (internal quotation marks omitted). "The mere existence of threats, violence . . . or other coercive police activity . . . does not automatically render a confession involuntary." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997). In determining whether a statement is voluntary, the court must consider the totality of the circumstances. *Swann v. Commonwealth*, 247 Va. 222, 231, 441 S.E.2d 195, 202 (1994). In so doing, "[t]he court must consider the

defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview." *Bottenfield,* 25 Va. App. at 323, 487 S.E.2d at 886.

B. *Discussion*

The Court has considered McKinney's Motion To Suppress, oral argument at the August 4, 2015, hearing, post-hearing briefs submitted by the parties, and applicable authorities. The Court now rules on the issues before it.

1. *The Officer Possessed Reasonable, Articulable Suspicion To Conduct an Investigative Detention of McKinney*

McKinney argues that the Officer did not possess reasonable, articulable suspicion to detain him for further investigation. The Court disagrees, holding that the Officer had reasonable suspicion to believe McKinney was involved in criminal activity beyond the initial basis for the traffic stop and that the Officer therefore was justified in conducting an investigative detention of McKinney.

Although "stopping an automobile and detaining its occupants constitute[s] a seizure within the meaning [of the Fourth Amendment]," not all seizures must be justified by probable cause. *Delaware v. Prouse,* 440 U.S. 648, 653 (1979); *see also Terry,* 392 U.S. at 24. An investigative detention occurs where an officer has reasonable, articulable suspicion that the individual seized is involved in criminal activity. *United States v. Brignoni-Ponce,* 422 U.S. 873, 878 (1975). Such seizures must be reasonable. *Id.* If an officer has reasonable suspicion and effectuates a *Terry* stop, the officer may conduct questioning limited to the purpose of that stop. *Florida v. Royer,* 460 U.S. 491, 498 (1983). Once the "police stop exceed[s] the time needed to handle the matter for which the stop was made[, it] violates the Constitution's shield against unreasonable seizures." *Rodriguez,* 135 S. Ct. at 1612.

It is settled law that, when a police officer has reasonable suspicion to conduct a traffic stop, he is authorized to seize the driver as well as all passengers of the vehicle. *Johnson,* 555 U.S. at 327. As the Officer observed, the vehicle in which McKinney was a passenger was being driven with an obscured license plate registration sticker, which constituted a traffic infraction. Obscuring any part of a registration sticker is a violation of Virginia Code. Va. Code § 46.2-716(B) (1950). Hence, the Officer possessed reasonable, articulable suspicion to conduct a traffic stop and further investigate possible criminal activity related to the obscured sticker.

Although the Officer initiated the traffic stop based solely on the obscured license plate registration sticker, the actions of the vehicle's occupants once

the patrol car emergency equipment was activated quickly transformed the complexion of the stop. The realm of potential criminal activity broadened as a result of the vehicle's elusive behavior and the fact that two of the vehicle occupants exited the vehicle and ran away immediately upon the vehicle's coming to a stop, leaving the vehicle to roll back and collide with the patrol car. Under the circumstances, the Officer was rightfully concerned as he approached McKinney — after the others with whom McKinney had been closely associated had fled for no apparent reason — and the Officer's partner no longer was in the vicinity.

At the time the Officer approached McKinney, he possessed reasonable suspicion imparted to him by both the initial traffic violation and the subsequent actions of the vehicle's occupants. *See Rodriguez*, 135 S. Ct. at 1615 (holding that, although an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," "he may not do so in a way that prolongs the stop, *absent the reasonable suspicion ordinarily demanded to justify detaining an individual*" (emphasis added)). As the Officer no longer was engaged in a traffic stop merely predicated on an obscured registration sticker, the Officer's actions in approaching McKinney and asking a question related to whether there were firearms in the vehicle did not violate the durational limitations placed on traffic stops by *Rodriguez*.

Considering the totality of the circumstances, the Court finds that the Officer possessed reasonable, articulable suspicion to stop the vehicle and seize McKinney while conducting further investigation.

### 2. The Officer's Actions during the Brief Period of Time from Observing until Questioning McKinney Constituted Investigative Detention and Not Custodial Arrest

McKinney argues that he was placed under arrest when the Officer pointed his service weapon at him and prepared to question him without probable cause. The Court disagrees and finds that, under the circumstances, McKinney was subject merely to investigative detention during the brief period of time between when he observed McKinney in the vehicle and when he was questioned by the Officer.

A proper *Terry* stop, or investigative detention, either will lead to an arrest, if reasonable suspicion ripens into probable cause, or prompt release of the suspect. In determining whether a suspect is in custody, courts consider, among other factors, the following:

> (1) the manner in which the individual is summoned by the police, (2) the familiarity or neutrality of the surroundings, (3) the number of officers present, (4) the degree of physical restraint, (5) the duration and character of the interrogation, and (6) the extent to which the officers' beliefs concerning the

> potential culpability of the individual being questioned were manifested to the individual.

*Harris,* 27 Va. App. at 565, 500 S.E.2d at 262.

"An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer,* 460 U.S. at 500. Further, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id.* Although an investigative detention can escalate into a custodial arrest, an officer's display of a firearm does not automatically effect the transformation, as long as the show of force is reasonable under the circumstances. *Harris,* 27 Va. App. at 563, 500 S.E.2d at 261. For example, in *Harris,* the Virginia Court of Appeals held that the officer's display of a firearm for "less than a minute . . . was a reasonable response to the [defendant's] failure to show his hands while moving in the trooper's direction." *Id.* at 563 (finding that there was no custodial arrest despite display of a firearm).

Here, the Officer's display of his weapon was very brief, and he soon thereafter opened the vehicle door so that he could inquire about whether there were weapons in the vehicle. The length of McKinney's detention prior to the Officer's question from the time the Officer drew his weapon until just prior to asking the question was extremely short.

Although the record lacks testimony on the exact length of McKinney's detention, the sequence of events in the case is not in controversy, and the Officer's uncontroverted testimony provides that McKinney's pre-arrest detention was limited to the following: the Officer pointing his firearm at McKinney; the Officer asking a single question regarding the presence of weapons in the vehicle and McKinney's response; the Officer ordering McKinney to exit the vehicle; and the Officer retrieving McKinney's weapon and taking McKinney into custody. The evidence further shows that McKinney was cooperative with the Officer throughout this interaction. The only reasonable inference to be drawn from the chain of events — based on the undisputed testimony of the Officer — therefore, is that the investigative detention occurred over a very short duration.

The Officer reholstered his weapon immediately after McKinney exited the vehicle and put his hands on the hood of the car, and the Officer then put McKinney in handcuffs. Although McKinney, unlike the defendant in *Harris,* was cooperative with the Officer, given the "'weighty [public] interest in officer safety' during traffic stops," the Court finds that the Officer's use of minimal force, through display of his firearm, was reasonable under the circumstances and did not elevate the investigative detention to a custodial arrest. *Harris,* 27 Va. App. at 562, 500 S.E.2d at 261.

In addition to the short duration of the detention, other factors support that McKinney was not in custody at the time he admitted possessing a concealed weapon. Although the time period at issue in this section of the

Opinion does not include questioning by the Officer, the Court notes that custodial arrest did not occur until *after* McKinney admitted to having a concealed weapon. The Officer was in a foreign jurisdiction. According to the Officer's testimony, "this was Chesapeake, so I [was] totally unfamiliar with that apartment complex." (Tr. 13-14.) Although the Officer was in unfamiliar surroundings, as a Norfolk officer in the City of Chesapeake, the area appeared neutral and not more favorable to either party. There was only one police officer present at all times the Officer interacted directly with McKinney. The Officer testified that he actually was alone with McKinney for more than ten minutes. (Tr. 21.) The alleged interrogation consisted of a single question; the character of the Officer's question related solely to public safety and not some criminal matter. The Officer had no way of knowing at the time he questioned McKinney that McKinney was a convicted felon and that it, therefore, was illegal for him to possess a firearm. The Officer knew that some criminal activity had recently transpired; and there was no evidence that the Officer believed in advance that McKinney was culpable of the crime to which he admitted. Hence, although the Officer pointed his service weapon at McKinney, given the totality of the circumstances, the Court finds that the detention was no longer than necessary to effectuate the purpose of the stop, including investigation of the actions of McKinney's cohorts after the police emergency equipment was activated and prior to the Officer approaching McKinney.

The Officer's interaction with McKinney between observing and questioning him, therefore, constitutes an investigative detention requiring only reasonable suspicion and not a custodial arrest requiring probable cause.

### 3. *McKinney Was Not Subjected to Custodial Interrogation in Contravention of His Miranda Rights*

McKinney argues that the weapon he possessed was discovered only as a result of unlawful interrogation. The Court disagrees, finding that, under the circumstances, McKinney was not subject to custodial arrest at the time the Officer asked him whether there were any weapons in the vehicle. Further, the Officer's question was not designed to elicit testimonial evidence but rather was designed to secure public safety. The fact that McKinney ultimately was arrested for possession of a firearm by a convicted felon does not somehow preclude the question also being related to officer and public safety.

A determination that an individual is "in custody" for purposes of *Miranda* is determined by the circumstances of each case, and "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Harris,* 27 Va. App. at 564 (quoting *California v. Behler,* 463 U.S. 1121, 1125 (1983)) (internal quotation marks omitted). As discussed *supra,* "*Terry* stops differ

from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion." *Leshuk*, 65 F.3d at 1109. Further, "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful [*Terry*] stop into a custodial arrest for *Miranda* purposes." *Id.* at 1109-10. Based on the circumstances present in this case and for the reasons expressed *supra*, the Court finds that the single question posed to McKinney did not transform his investigative detention into a custodial arrest.

Because McKinney was not in custody, the officers were not obligated to inform him of his Fifth Amendment right to remain silent. *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966) (holding that, "*if a person in custody is to be subjected to interrogation*, he must first be informed in clear and unequivocal terms that he has the right to remain silent" (emphasis added)). The Court does not find persuasive McKinney's argument in his post-hearing brief that a violation of McKinney's *Fifth Amendment right to remain silent* "does not turn on whether or not the defendant is in custody, nor does it turn on whether he was read *Miranda* warnings." (McKinney Br. in Supp. of Mot. To Suppress 3.) McKinney rather appears to be asserting a defense that his statement was not voluntary, which is discussed *infra*.

Even had McKinney been "in custody" for purposes of *Miranda*, *arguendo*, the Officer's inquiry into the presence of weapons did not constitute interrogation but instead was governed by the public safety exception to the *Miranda* requirement. *See New York v. Quarles*, 467 U.S. 649, 656 (1984). The U.S. Supreme Court has held that this exception applies to "questions necessary to secure [the officer's] own safety." *Id.* at 659. Here, the Officer testified that he routinely asks about the presence of weapons when conducting traffic stops, suggesting that the question is not interrogative in nature but rather is focused on a concern for safety during traffic stops. An inquiry regarding the presence of weapons is even more rational when the vehicle's occupants have shown themselves to be evasive and unpredictable, and such circumstances certainly could cause a reasonable officer to be on heightened alert and sense a very real threat to his or her safety. In fact, in this case the Officer testified that he was concerned about his safety in light of the vehicle pursuit and the flight of McKinney's companions. (Tr. 20.)

Courts have recognized the inherent risks police officers face when conducting traffic stops. *See, e.g., Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (noting that in 1994 alone, 5,762 police officers were assaulted and eleven were killed during traffic pursuits and stops); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (finding that "a significant percentage of murders of police officers occurs when the officers are making traffic stops"); *United States v. Stanfield*, 109 F.3d 976, 978 (4th Cir. 1997) (finding that "law enforcement officials literally risk their lives each time

they approach occupied vehicles during the course of investigative traffic stops"). The U.S. Supreme Court has identified a number of actions police officers can take *as a matter of course* to ensure officer safety during traffic stops. These permissible actions, which do not require the officer to articulate any additional suspicion beyond that justifying the stop, include ordering the occupants to exit the vehicle, *Mimms*, 434 U.S. at 110, and using a flashlight to view the dark interior of the vehicle, *Texas v. Brown*, 460 U.S. 730, 739-40 (1983) (plurality).

At least two federal circuit courts of appeals have expressly held that an officer's questions during a traffic stop regarding the presence of weapons in a vehicle are justified in the interest of officer safety. "In addition to information about loaded weapons that the officer may obtain from visually looking in the car, or asking the motorist and occupants to step out of the car or to keep their hands raised – all procedures authorized by the courts in the name of officer safety," officer safety likewise justifies the less intrusive approach of asking vehicle occupants about the presence of weapons. *United States v. Holt*, 264 F.3d 1215, 1223 (10th Cir. 2001); see also *United States v. Liddell*, 517 F.3d 1007, 1009-10 (8th Cir. 2008) (holding that "the risk of police officers being injured by the mishandling of unknown firearms . . . provides a sufficient public safety basis to ask a suspect whether there are weapons or contraband in a car"). Of course, the reasonableness of any law enforcement action is based on the situation presented.

In light of the totality of the circumstances leading up to the Officer's question to McKinney, including the obscured license plate registration, the evasive behavior of the vehicle, and the subsequent flight of the other vehicle occupants, the Court finds that a reasonable officer would be concerned about his or her safety and that the Officer here was justified in asking McKinney about the presence of weapons in the vehicle.

Because McKinney was not in custody at the time the Officer pointed his service weapon and asked whether there were any weapons in the vehicle and because the query was to determine the extent of a potential threat to public safety and not to elicit testimonial evidence, McKinney was not subjected to custodial interrogation. Even if he had been subjected to custodial interrogation, *arguendo*, the public safety exception permitted the Officer to ask about the presence of weapons without giving McKinney *Miranda* warnings.

### 4. *McKinney's Statement Regarding His Possession of a Weapon Was Voluntary*

McKinney argues — for the first time in his post-hearing brief — that his response to the Officer's question should be suppressed because it was not made voluntarily. McKinney claims that his statement, admitting to possession of a firearm, was not voluntary because the Officer impliedly

threatened physical harm by pointing his service weapon at McKinney during the exchange of question and answer.

As an initial matter, this issue is not properly before the Court because it was not raised in McKinney's motion or argued by McKinney's counsel during the hearing. There is no mention of coercion, duress, or involuntariness in McKinney's Motion To Suppress (*see supra*), nor was there any mention of those issues during the hearing. In addition to being contrary to the procedure established by, *inter alia*, Norfolk Circuit Court local rules, the Commonwealth has not had the opportunity to respond to this argument. Pursuant to the procedure established by the Court at the hearing, the parties submitted post-hearing briefs simultaneously. Further, although McKinney in his post-hearing brief articulates his voluntariness argument as a Fifth Amendment right to remain silent, it more properly should be characterized as a Fourteenth Amendment right to due process.

Even had McKinney properly placed the issue before the Court, the Court would not find it persuasive under the facts present here. As discussed *supra*, the Court finds the Officer's actions, including pointing his service weapon at McKinney and asking, in the interest of public safety, whether there were weapons present in the vehicle, reasonable under a totality of the circumstances analysis. Although pointing a firearm at another could represent a coercive activity, additional facts are present here, including the following: McKinney must have been aware that his compatriots had fled the scene and that the Officer, therefore, had reason to be concerned; there were no accompanying threatening words from the Officer; the Officer did not engage in any deception or misrepresentation; the duration of the allegedly coercive activity was very short; no evidence was presented that McKinney's age, intelligence, mental or physical condition, or background affected his ability to freely choose whether to confess to possessing a weapon; and as a convicted felon, McKinney had some familiarity with the criminal justice system. Stated differently, the totality of the evidence supports that McKinney "was fully cognizant of his situation, was in control of his cognitive powers, understood the circumstances, and was exercising his free will when he admitted his involvement. . . . [T]he circumstances . . . were not so compulsive or coercive that [he] was prevented from weighing his options, understanding the situation, and making a knowing and calculated decision to confess to his involvement." *Wilson v. Commonwealth*, 13 Va. App. 549, 554, 413 S.E.2d 655, 658 (1992).

Based on the totality of the circumstances, the Court finds that McKinney's statement was the product of an essentially free and unconstrained choice and that his will was not overborne and his capacity for self-determination was not critically impaired. The Court, therefore, finds that McKinney's statement regarding possession of a firearm was voluntary.

*Conclusion*

The Court finds, based on the facts and circumstances present in this case, that the Officer's actions were justified and did not violate McKinney's Fourth, Fifth, or Fourteenth Amendment rights. The Commonwealth satisfied its burden of establishing that there was reasonable, articulable suspicion to conduct an investigative detention of McKinney; the Officer's actions during the brief period of time between observing and questioning McKinney constituted investigative detention; the Officer's questioning of McKinney regarding the presence of weapons, under the conditions present, did not constitute custodial interrogation, and, even if they did, a *Miranda* warning was not required based on public safety; and McKinney's statement regarding his possession of a weapon was voluntary.

The Court denies McKinney's Motion To Suppress evidence obtained from the investigative detention.