# CIRCUIT COURT OF THE CITY OF NORFOLK

Commonwealth of Virginia

   v.

Jevon Glenn Augustus, Sr.

September 25, 2015

Case No. (Criminal) CR14-809

By Judge David W. Lannetti

Today the Court rules on the motion filed by Defendant Jevon Glenn Augustus, Sr., seeking to suppress evidence discovered during a vehicular stop and subsequent custodial search (the "Motion To Suppress"). The issues before the Court are: (1) whether there was reasonable, articulable suspicion that Augustus had been involved in a drug transaction to support an investigatory detention; (2) whether evidence of his subsequent alleged traffic infractions is admissible; (3) whether there was reasonable, articulable suspicion that he had committed traffic infractions to support an

investigatory detention; (4) whether evidence of his alleged obstruction of justice is admissible; and (5) whether evidence from the drug-dog search and custodial search is admissible. The Court finds: (1) reasonable, articulable suspicion that Augustus was involved in a drug transaction did not exist; (2) evidence of the alleged traffic infractions is fruit of the poisonous tree and, therefore, is suppressed; (3) reasonable, articulable suspicion that he committed the alleged traffic infractions did not exist; (4) evidence of his alleged obstruction of justice is admissible; and (5) evidence from the drug-dog search and custodial search is not admissible.

Based on the totality of the circumstances, the Court grants the Motion To Suppress except for evidence related to the events constituting Augustus' alleged obstruction of justice.

## Background

On January 4, 2014, Norfolk Vice and Narcotics Division Investigators B. P. Allison and J. A. McCarthy (the "Investigators") were parked in an unmarked police vehicle near the corner of Kincaid Avenue and Aspin Street in the City of Norfolk, an intersection described by one of the Investigators as a "suspected drug location." (Tr. 15, 36, 93-94.) Investigator Allison based this characterization on the following, which occurred during the several months prior to the incident: his personal involvement in two search warrants, one on Aspin Street and one on Kincaid Avenue; arresting individuals "coming from Aspin Street with narcotics"; and conducting "probable-cause buys on Aspin Street" across the street from where Augustus' truck was that night. (Tr. 15.) At approximately 11:38 p.m., a pickup truck driven by Augustus drove down Aspin Street and pulled over on the side of the road near a multi-unit housing complex. (Tr. 16.) There were no passengers in the pickup truck with Augustus. Although there was a parking lot associated with the housing complex, the pickup truck remained alongside the road and did not enter the lot. (Tr. 45-46.) An individual approached the truck from the direction of the complex, opened the truck's passenger-side door, "leaned into the vehicle for a very brief period of time," shut the door he had opened, and "ran back towards where he came from." (Tr. 17.) The truck departed immediately thereafter. (Tr. 17.) From their vantage point, the Investigators could not see what transpired within the cabin of the truck and could not determine whether the individual who had approached the truck had anything in his hands before or after reaching into the truck. (Tr. 51-52.) One of the Investigators testified that he was not sure whether the dome light in the interior of the truck even illuminated when the passenger-side door was open. (Tr. 17.) At no time during the encounter with the individual did the Investigators observe Augustus move within the truck cabin or observe the individual and Augustus touch or pass anything. (Tr. 53-54.)

One of the Investigators notified Investigator R. W. Gillespie, who was in another unmarked car in the vicinity, that they had observed a narcotics transaction and asked Gillespie to assist in pulling over the truck. (Tr. 61-62, 94.) Gillespie immediately sighted the truck and began following it. (Tr. 95.) The Investigators' vehicle soon caught up and fell in behind Gillespie's vehicle. (Tr. 62-63.) Gillespie activated his emergency equipment to initiate a stop based on the alleged drug transaction. (Tr. 96.) Gillespie testified that he first energized his emergency lights and, when Augustus did not immediately pull over, he activated his siren a "few seconds" later. (Tr. 96.) Investigator Allison energized the Investigators' vehicle emergency equipment once he saw that Gillespie did the same. (Tr. 63.) Testimony at the September 3, 2015, hearing indicated that the following occurred *after* Gillespie activated his vehicle emergency equipment: the truck sped up a little, but stayed under the posted speed limit; Augustus at one point appeared to "be almost standing up" behind the wheel; and the truck weaved several times within its lane. (Tr. 65-66, 96-98, 104.) Although there was some testimony that the truck touched or crossed the dividing line between opposing lanes of traffic, in light of the totality of the testimony, the Court finds that the truck weaved only within its lane. (Tr. 97, 108-09, 117.) Gillespie testified that the truck was "a full size, one of the really large, like dually-type pickup truck[s]" and that, when he observed it, the truck "filled up the entire lane almost." (Tr. 108.) A "dually truck" is a truck that has a reinforced rear end with dual rear wheels (*i.e.,* four wheels on the rear axle), making it wider than a comparable truck with only two rear wheels. He further testified that: Augustus' actions after the emergency equipment was energized were not "outlandish"; the weaving was the extent of any sort of traffic violation; and his stop was based solely on the alleged drug transaction. (Tr. 105-07.) Augustus stopped his truck less than two blocks after Gillespie activated his emergency equipment. (Tr. 65, 109.) Investigator Allison's actual testimony was that the distance was "maybe a block or two" (Tr. 64-65); counsel subsequently referred to this distance as a block and a half, to which the witnesses agreed. The less-than-two-block distance is corroborated by Investigator Allison's testimony that the stop occurred less than four minutes after he witnessed the alleged drug transaction, (Tr. 72), and Investigator McCarthy's testimony that the total distance that Augustus' truck traveled from where the alleged drug transaction occurred to where the vehicle pulled over was five or six blocks. (Tr. 138-39.) After the stop and after he realized Augustus would not consent to a vehicular search, Investigator Allison called for a drug dog and handler. (Tr. 73.)

When approached after the stop, Augustus was minimally cooperative. (Tr. 99-100, 122.) He merely cracked the driver-side truck window "just a little bit about maybe an inch" in order to pass through his driver's license and registration. (Tr. 99.) According to Gillespie, Augustus appeared

nervous, was breathing heavily, was staring straight ahead and would not make eye contact, and was "a little shaky." (Tr. 99-100.) When the drug dog and its handler, Investigator D. W. Todd, arrived, Augustus was asked to exit the truck; he refused. (Tr. 24.) Todd testified that normal protocol is to conduct a drug-dog sweep with no one in the vehicle, as a safety measure for the dog handler. (Tr. 150-51.) In light of the circumstances, Todd elected to conduct the narcotics sweep with Augustus still in his truck, and the dog subsequently alerted on the truck's driver-side door handle. (Tr. 151-52.) The dog handler testified that there were enough police officers in the immediate vicinity to assuage any concerns about safety. In addition to the two Investigators and Gillespie, at least one marked patrol car had arrived prior to the drug-dog sweep. (Tr. 151.) Augustus again was asked to exit the truck, and he again refused. (Tr. 31.) Augustus was informed that, by not exiting the truck as instructed, he was obstructing justice; Augustus still remained in his truck. (Tr. 88.) Investigator Allison then broke the truck's passenger-side window and unlocked the passenger-side door, and several law enforcement personnel forcibly removed Augustus from the vehicle and placed him in custody. (Tr. 31, 78-80, 124.) Investigator Allison testified that Augustus re-locked the door several times as the Investigator attempted to gain entry. (Tr. 31-32).

"Whether a suspect is 'in custody' under *Miranda* is determined by the circumstances of each case, and 'the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." *Harris v. Commonwealth*, 27 Va. App. 554, 564, 500 S.E.2d 257, 262 (1998) (quoting *California v. Behler*, 463 U.S. 1121, 1125 (1983)). "*Terry* stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion." *United States v. Leshuk*, 65 F.3d 1105, 1109 (4th Cir. 1995).

Here, the Court finds that Augustus was taken into custody when he was removed from his truck. Investigator McCarthy searched Augustus' person, felt a suspect object in Augustus' groin area, and informed Augustus that he would be taken to the Police Operations Center (the "POC"), where the item would be retrieved. (Tr. 125-26.) Although plastic baggies were located under the truck, the parties stipulated that they were empty and did not contain any drug residue. (Tr. 155.) Augustus subsequently was taken to the POC, where another custodial search was conducted; the suspect object, which turned out to be cocaine, fell from Augustus' pants during the search. (Tr. 127-28.) Augustus was charged with possession of cocaine and obstruction of justice.

Augustus subsequently filed the Motion To Suppress that is the subject of this Opinion, along with a supporting brief. The parties were before the Court for a hearing on September 3, 2015. The Court granted leave for the parties to file post-hearing briefs; Augustus filed a brief, but the Commonwealth elected not to do so.

*Positions of the Parties*

### A. *Defendant's Motion To Suppress*

During the hearing and in his pre-hearing and post-hearing briefs in support of his Motion To Suppress, Augustus argued that the Investigators lacked reasonable, articulable suspicion to stop him based on the alleged drug transaction. He claimed that, contrary to claims by the Investigators, the location of the housing complex at which he stopped was not within a high-drug neighborhood and that there was no evidence of a drug transaction. According to Augustus, the Investigators at best were reacting to a "hunch" and not on reasonable, articulable suspicion of a drug transaction. He also asserted that the alleged traffic infractions, speeding up, standing up, and weaving, did not in fact constitute criminal activity and that, in any case, the alleged infractions occurred only after Gillespie activated his emergency equipment while pursuing an unconstitutional stop. Augustus further argued that his actions after the stop did not constitute obstruction of justice and that the custodial search was not justified.

Augustus requests that the Court suppress all evidence and statements resulting from the stop and the subsequent custodial search.

### B. *Commonwealth's Response*

At the hearing, the Commonwealth argued that reasonable, articulable suspicion existed to stop Augustus based on the suspected drug transaction. (The Commonwealth did not file a responsive brief to Augustus' Motion To Suppress prior to the hearing, nor did it file a post-hearing brief.) Specifically, the Commonwealth claimed that the stop was supported by the unusual actions taken at a roadside at night in a high-drug neighborhood during a very short period of time. The Commonwealth further asserted that, even if there were not reasonable suspicion of a drug transaction, Augustus committed traffic infractions that provided the reasonable suspicion necessary to support an investigatory detention. The Commonwealth also argued that Augustus' actions after the stop constituted obstruction of justice and that the drug-dog alert provided probable cause, either of which justified the custodial search of Augustus that yielded the drugs.

*Analysis*

### A. *Legal Standard*

Pursuant to the exclusionary rule, evidence must be suppressed if it is seized by the government in violation of the Fourth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). A court shall exclude evidence that was obtained either: (1) as a direct result of an illegal search and seizure; or

(2) as a proximate result of an illegal search and seizure. *Wong Sun v. United States*, 371 U.S. 471, 485-86 (1963). For Fourth Amendment purposes, a search or seizure typically requires a warrant, and the required standard of proof for issuance of such a warrant is probable cause. U.S. Const., amend. IV.

Police can detain a person without probable cause if there is reasonable, articulable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). In determining whether an officer had an objective basis for reasonable, articulable suspicion, a court must consider the totality of the circumstances. *Whitaker v. Commonwealth*, 279 Va. 268, 274, 687 S.E.2d 733, 736 (2010). It is well established that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). An officer's "action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action'." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (emphasis added) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)).

Conducting an investigatory stop of an automobile is a seizure for Fourth Amendment purposes. *Jackson v. Commonwealth*, 267 Va. 666, 672, 594 S.E.2d 595, 598 (2004) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). An officer need only have reasonable, articulable suspicion to "detain a person for the purpose of investigating possibly criminal behavior," and such a stop is valid "even though there is no probable cause to make an arrest." Whitfield v. Commonwealth, 265 Va. 358, 361, 576 S.E.2d 463, 464 (2003) (citing *Terry*, 392 U.S. at 22). The stopping officer's reasonable suspicion needs to be "based on objective facts, that the individual is involved in criminal activity." *Id.* (citing *Brown v. Texas*, 443 U.S. 47, 51 (1979)).

A seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Malbrough v. Commonwealth*, 275 Va. 163, 169, 655 S.E.2d 1, 4 (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). "A person is 'seized' within the meaning of the Fourth Amendment if, under the circumstances presented, a reasonable person would believe he was not free to leave the scene of an encounter with the police." *McCain v. Commonwealth*, 261 Va. 483, 490, 545 S.E.2d 541, 545 (2001) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)) (other citations omitted).

Although the threshold level of requisite suspicion for a *Terry* stop is fairly low, the stop cannot be based on certain mistaken beliefs. Courts draw a distinction between an officer's mistake of law and an officer's mistake of fact. Courts generally treat an officer's mistake of law as objectively unreasonable and, therefore, insufficient to justify a *Terry* stop. *Commonwealth v. Snyder*, 2007 Va. App. LEXIS 307, at *14 (Va. App. Aug. 14, 2007). As is appropriate, the Court does not consider the unpublished

Court of Appeals Opinion to hold precedential value. The Court instead considers the rationale offered by the Court of Appeals to the extent that the Court finds it persuasive, which is permissible. *See Fairfax Cty. Sch. Bd. v. Rose*, 29 Va. App. 32, 39, n. 3, 509 S.E.2d 525, 528, n. 3 (1999) ("[A]lthough an unpublished opinion . . . has no precedential value . . . a court . . . does not err by considering the rationale in adopting it to the extent it is persuasive."). Courts view an officer's mistake of fact, by contrast, as acceptable if it is objectively reasonable. *Barnette v. Commonwealth*, 23 Va. App. 581, 584, 478 S.E.2d 707, 708 (1996).

A dog sniff is not a search for Fourth Amendment purposes. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). An officer needs reasonable, articulable suspicion to support a dog sniff, however, in order to extend the duration of a traffic stop beyond that otherwise necessary to pursue the traffic infractions related to the stop. *See Lawson v. Commonwealth*, 55 Va. App. 549, 558, 687 S.E.2d 94, 98 (2010). A drug-dog alert provides police probable cause to search an automobile, *Jones v. Commonwealth*, 277 Va. 171, 180, 670 S.E.2d 727, 732 (2009), although particularized probable cause is necessary to search the individual occupants of the automobile. *Whitehead v. Commonwealth*, 278 Va. 300, 313, 683 S.E.2d 299, 305 (2009).

"[I]f a person engages in new and distinct criminal acts in response to unlawful police conduct, the exclusionary rule does not apply, and evidence of the events constituting the new criminal activity, including testimony describing the defendant's own actions, is admissible." *Brown v. City of Danville*, 44 Va. App. 586, 600, 606 S.E.2d 523, 530 (2004).

The defendant seeking to suppress evidence bears the burden of proving factual circumstances giving rise to the reasonable expectation of privacy, which is the burden of persuasion. *Testa v. Commonwealth*, 55 Va. App. 275, 282, n. 3, 685 S.E.2d 213, 216, n. 3 (2009). When responding to a motion to suppress, the Commonwealth has the burden to prove admissibility of the seized evidence by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). The Commonwealth bears the burden of proving that an investigatory traffic stop is lawful, and "[i]n determining whether an 'articulable and reasonable suspicion' justifying an investigatory stop of a vehicle exists, courts must consider 'the totality of the circumstances — the whole picture'." *Logan v. Commonwealth*, 19 Va. App. 437, 441, 452 S.E.2d 364, 367 (1994) (quoting *Murphy v. Commonwealth*, 9 Va. App. 139, 144, 384 S.E.2d 125, 127 (1989)). The Virginia Court of Appeals has held that courts "need only review the whole picture to determine whether the circumstances collectively are sufficient to justify the initial stop for routine questioning." *Castaneda v. Commonwealth*, 7 Va. App. 574, 581, 376 S.E.2d 82, 85 (1989).

B. *Discussion*

The Court has considered Augustus' Motion To Suppress and supporting brief, oral argument at the September 3, 2015, hearing, Augustus' post-hearing brief, and applicable authorities. The Court now rules on the issues before it.

1. *Reasonable, Articulable Suspicion That Augustus Was Involved in a Drug Transaction Did Not Exist*

Augustus argues that the Investigators and Gillespie did not possess reasonable, articulable suspicion to initiate a stop based on the alleged drug transaction. The Court agrees, holding that the events the Investigators described observing that night, including the Investigators' characterization of the neighborhood as a "suspected drug location," are insufficient to satisfy the reasonable suspicion necessary to justify pulling over Augustus.

The Commonwealth claims that there was reasonable suspicion based on the alleged unusual actions taken at a roadside at night in a high-drug neighborhood. These actions consist of an unidentified individual approaching Augustus' truck, opening the truck's passenger-side door, leaning in for a very brief period of time, and then shutting the door and leaving. Due to the distance and the lighting conditions, the Investigators could not see what occurred inside the truck's cab and, more specifically, could not see whether Augustus and the unidentified individual exchanged anything. The Investigators apparently viewed the neighborhood as a high-drug neighborhood, and it appears that they consciously were in the vicinity of where Augustus' truck briefly parked based on that belief. On cross-examination, the Investigators admitted that they were aware of only a relatively small number of drug transactions in the neighborhood and that they did not have any specific information regarding illegal activity at the housing complex adjacent to where Augustus parked that night. They also were not sure what housing unit, if any, the unidentified individual came from or went to.

To support reasonable suspicion, an officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch'." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27). The question here is whether the facts support a reasonable suspicion, as opposed to a mere "hunch," of a drug transaction. Courts in Virginia have attempted to articulate the appropriate line of demarcation for such a test.

In *Rudolph v. Commonwealth*, an officer on patrol at night in a "high crime area" observed a vehicle with its lights off parked in the rear of a gas station in an unmarked parking area. 277 Va. 209, 209, 722 S.E.2d 527, 528 (2009). The officer thought the circumstances were unusual because he did not believe that customers used the rear entrance at night. *Id.* He also was

able to observe the driver and an occupant in the parked vehicle and saw the driver move around and bend down a couple of times as if he were looking or reaching for something inside the vehicle. *Id.* at 210, 722 S.E.2d at 528. The officer stopped the vehicle as it attempted to pull away and eventually discovered marijuana in the vehicle. *Id.* The Virginia Supreme Court held as follows:

> In order to conduct an investigatory stop, a police officer need not have probable cause; he must have a reasonable suspicion, based on objective facts, that the person is involved in criminal activity. To establish reasonable suspicion, an officer must be able to articulate more than an unparticularized suspicion or "hunch" that criminal activity is afoot. A court must consider the totality of the circumstances when determining whether a police officer had a particularized and objective suspicion that the person stopped was involved in criminal activity. The fact that the stop occurred in a "high crime area" is a relevant factor; however, this fact is insufficient to supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped.
>
> [The] circumstances and actions observed by [the officer] were not enough to create a reasonable articulable suspicion that criminal activity was afoot.

*Id.*

In *McCain v. Commonwealth*, an officer observed a vehicle park in front of a house and the two occupants of the vehicle subsequently walk to the front of the house and return to the vehicle less than a minute later. 275 Va. 546, 550, 659 S.E.2d 512, 514 (2008). The officer "did not observe any suspected drug activity or transaction when [the defendant] went to the house, but he was aware of a controlled purchase of drugs at the house 'months' before [the defendant] approached the house, which is in a 'high drug area'." *Id.* at 552-53, 659 S.E.2d at 516. There, the Virginia Supreme Court held that "[the defendant's] brief presence at the house the officer associated with drug activity months prior [did] not support a reasonable inference of criminal activity." *Id.* at 553, 659 S.E.2d at 516. The Court went on to hold that, although the officer "may have had a hunch that [the defendant] was involved with drugs based on the neighborhood and the house [the defendant] visited . . . such a hunch did not rise to the level of reasonable suspicion." *Id.* at 554, 659 S.E.2d at 517.

By contrast, the Virginia Court of Appeals found reasonable suspicion existed where an investigator conducted a thorough two-week surveillance of the defendant during which he observed the defendant "leaving his apartment in his Jeep and apparently conducting drug transactions from his Jeep in a nearby park on multiple occasions" and "saw several individuals on

different occasions park their vehicles in the driveway of [the defendant's] apartment, enter the apartment, stay for approximately five minutes, and then exit the apartment." *Lawson v. Commonwealth*, 55 Va. App. 549, 553, 555-56, 687 S.E.2d 94, 95-96 (2009). The court held that, based on the numerous specific observations of suspected criminal activity over the two-week period, there was reasonable, articulable suspicion to initiate an investigatory stop. 55 Va. App. at 559-60, 687 S.E.2d at 99.

The Court of Appeals also found there was reasonable, articulable suspicion in *Sanchez v. Commonwealth*, 2010 Va. App. LEXIS 241, at *5 (Va. App. June 15, 2010). There, an officer observed the defendant "sitting on a retaining wall in the front yard of a house notorious for its *recent* drug activity," a house that had been the subject of numerous raids by law enforcement, including one that occurred one week prior to this incident. The officer observed the defendant drive to the residence and engage in what appeared to be "a hand-to-hand drug transaction" with an individual who left the front yard of the residence. The two men did not appear to converse at all, and the defendant left immediately after the transaction. The court found it significant that "unlike most cases involving reasonable suspicion in which an officer will simply characterize an area as a 'high crime area,' here, [the officers] focused their testimony on the specific nature and history of criminal activity at this particular house, including illicit activities that had very recently transpired therein." *Id.* at *5, n. 2.

The Court finds that the facts here are much closer to those in Rudolph and *McCain* than those in *Lawson* and *Sanchez*. As an initial matter, insufficient evidence was presented to demonstrate that this neighborhood and, specifically, that the specific housing complex adjacent to where Augustus parked truly is a location at which a large number of illegal drug transactions had occurred in the recent past; in fact, there was not evidence presented regarding the specific nature and history of illegal drug transactions *at this particular housing complex*. Even if there were credible evidence that this was a high drug area, the circumstances of a high drug area and a nighttime encounter are not dispositive. *See McCain*, 275 Va. at 552, 659 S.E.2d at 516 ("The character of the location and the time at which a person is observed are relevant factors, but they do not supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped." (citing *Brown v. Texas*, 443 U.S. 47, 51-52 (1979); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000))). Additionally, there is no evidence that Augustus was involved in an actual transfer of *anything*, as the Investigators could not see inside the truck cabin and there was nothing observable in the hands of the unidentified individual before or after he opened the truck's passenger-side door.

Considering the totality of the circumstances, the Court finds that the Investigators did not possess reasonable, articulable suspicion that Augustus was involved in a drug transaction.

There was some discussion at the hearing regarding whether there was valid transference of reasonable, articulable suspicion for the alleged drug transaction from the Investigators, who observed the alleged transaction, to Gillespie, who conducted the actual stop. The Court need not address this issue, as it finds that the Investigators did not have reasonable, articulable suspicion for the alleged drug transaction in the first place.

*2. Evidence of the Alleged Traffic Infractions Is Fruit of the Poisonous Tree and, Therefore, Is Suppressed*

Even if Augustus had committed the alleged traffic infractions, based on the circumstances here, evidence resulting from the seizure, including the traffic infractions themselves, is inadmissible pursuant to the exclusionary rule. Augustus was seized for Fourth Amendment purposes when Gillespie energized his emergency equipment, which was prior to the alleged traffic infractions, and Augustus did nothing inconsistent with acceding to Gillespie's show of authority and, in fact, voluntarily complied with the signal to pull over. *See Barrett v. Commonwealth*, 18 Va. App. 773, 775, 447 S.E.2d 243, 245 (1994), *rev'd on other grounds*, 250 Va. 243, 462 S.E. 2d 109 (1995) ("Clearly, [the defendant] was seized when [the officer] pulled in behind him and activated his flashing lights."); *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("An arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority."). The alleged traffic violations, therefore, constituted new crimes committed after an unconstitutional seizure that were not directed at Gillespie or other law enforcement officers.

Because Gillespie energized his emergency equipment based only on the alleged drug transaction, and prior to the alleged traffic infractions, Gillespie lacked reasonable suspicion to activate his emergency equipment. Energizing police vehicular emergency equipment is a recognized showing of authority, and a reasonable person seeing a police vehicle with activated lights immediately behind him or her and hearing a siren would understand that he or she was not free to leave the scene of the police encounter. *Barrett*, 18 Va. App. at 776, 447 S.E.2d at 245. Under those conditions, Augustus did nothing inconsistent with submitting to the authority of law enforcement.

The Court acknowledges the Investigators testified that, after their emergency equipment was activated, Augustus sped up slightly, although staying below the speed limit. The Court finds that a reasonable officer would not conclude, under those circumstances, that Augustus was trying to evade or elude law enforcement or that he was doing anything other than submitting to the authority of Gillespie. There also was no testimony at the hearing to support that Gillespie arrived at such a conclusion.

Because the alleged traffic infractions occurred after the unconstitutional seizure, they are new and distinct crimes from the alleged drug transaction.

The Court, therefore, must determine whether evidence related to the traffic infractions is barred by the exclusionary rule or satisfies the "new and distinct crime" exception to the exclusionary rule. If the evidence is not suppressed, it could provide the necessary reasonable suspicion, which was lacking based on the alleged drug transaction, to legally stop Augustus.

The exclusionary rule generally prohibits "derivative evidence relating to the suppressed tangible physical objects or verbal statements" from being admitted — the so-called "fruit of the poisonous tree" doctrine. *Brown v. City of Danville*, 44 Va. App. 586, 599, 606 S.E.2d 523, 530 (2004). The granting of a motion to suppress based on an illegal seizure does not, however, somehow provide the defendant unfettered discretion to commit new crimes. *See id.* at 600, 606 S.E.2d at 530-31 (noting that "the limited objective of the exclusionary rule is to deter unlawful police conduct — not to provide citizens with a shield so as to afford an unfettered right to threaten or harm police officers in response to the illegality" (quoting *State v. Brocuglio*, 264 Conn. 778, 826 A.2d 145, 152 (2003))).

As discussed in more detail *infra*, Virginia courts have expressly held that an exception to the exclusionary rule exists for new or distinct retaliatory crimes directed against law enforcement officers. A noted criminal law scholar summed up the subsequent crimes that are exempt from the exclusionary rule as crimes committed as a reaction to the unlawful search and seizure, including: attacking the officer; fleeing from the officer; attempting to bribe the officer; threatening the officer with harm; attempting to destroy evidence; and making some criminal representation in an effort to bring the incident to a close. 6 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment*, § 11.4(j) (5th ed. 2012) (quoted in *C.P. v. Indiana*, 2015 Ind. App. LEXIS 475, at *11-*12 (2015)). For purposes of this Opinion, the Court will refer to these as "retaliatory crimes" against law enforcement. Although the holdings of these courts arguably limit this exception to new and distinct retaliatory crimes against law enforcement, Virginia appellate courts apparently have not specifically addressed the *non-retaliatory* "new and distinct crime" situation. At least one circuit court looked at the issue and concluded that "the utility of a bright-line rule and the public policy which the 'new and distinct crimes' exception serves" supports treating all new and distinct crimes as exceptions to the exclusionary rule, which resulted in evidence of the "new crime" of forging a public document being admissible despite an illegal seizure. *Commonwealth v. Cooper*, 56 Va. Cir. 501, 504 (2001). In addition to the facile application of a bright-line test, *Cooper* was decided prior to the seminal Virginia Court of Appeals decision on the issue. *See Brown v. City of Danville*, 44 Va. App. 586, 606 S.E.2d 523 (2004). Nevertheless, policy considerations support limiting this exclusionary rule exception to retaliatory crimes against law enforcement officers.

The first Virginia appellate decision to substantively discuss the "new and distinct crime" exception to the exclusionary rule was *Brown v. City of Danville*, 44 Va. App. at 600, 606 S.E.2d at 530. The Virginia Supreme Court had previously mentioned the exception without substantive discussion. *See Woodson v. Commonwealth*, 245 Va. 401, 406, 429 S.E.2d 27, 30 (1993). Of note, the Fairfax Circuit Court adopted the exception in *Commonwealth v. Davis*, 53 Va. Cir. 140 (Fairfax Cty. 2000). There, the court noted that "federal and state courts alike have uniformly rejected the argument that trial courts should suppress 'evidence relating to [the defendant's] *violence or threatened violence toward police officers* subsequent to an unlawful search or seizure or a warrantless entry'." *Id.* at 599, 606 S.E.2d at 530 (emphasis added) (quoting *United States v. Wampekenay*, 973 F.2d 1533, 1537 (10th Cir. 1992)) (citing cases). Agreeing with "the overwhelming weight of authority on this issue," the court went on to hold that, "if a person engages in new and distinct criminal acts in response to unlawful police conduct, the exclusionary rule does not apply, and evidence of the events constituting the new criminal activity, including testimony describing the defendant's own actions, is admissible." *Id.* at 600, 606 S.E.2d at 530.

The Virginia Court of Appeals' holding in *Brown*, therefore, limits the "new and distinct crime" exception to subsequent criminal acts related to the defendant's violence or threatened violence toward the police officers in response to their illegal search or seizure. *Id.* at 599-600, 606 S.E.2d at 530 ("What is present here is simply an attempt to suppress evidence which is a result of allegedly willful acts of misconduct by [the defendant], whose provocation and perhaps ultimate defense may be found in the fact of the [police conduct] itself. The exclusionary rule does not reach this far.") (quoting *Commonwealth v. Saia*, 372 Mass. 53, 360 N.E.2d 329, 332 (1977)). Although subsequent Court of Appeals decisions discuss this exception, they also involved retaliatory behavior and resulted in similar holdings. *See Testa v. Commonwealth*, 55 Va. App. 275, 284, 685 S.E.2d 213, 217 (2009) (obstruction of justice); *Stout v. Commonwealth*, 2009 Va. App. LEXIS 472, at *21-23 (Va. App. Oct. 20, 2009) (bribery of a police officer); *Messier v. Commonwealth*, 2007 Va. App. LEXIS 201, at *3-6 (Va. App. May 15, 2007) (assault and battery on a police officer and obstruction of justice). *See supra*.

Here, the alleged traffic infractions do not fall within the exclusionary rule exception, as they were neither retaliatory nor directed at the Investigators or Gillespie. They also arguably were not in response to the actions of the law enforcement officers. Under this rationale, any evidence of the traffic infractions, therefore, should be suppressed.

Because the circumstances in *Brown* involved a "struggle" between the defendant and police officers, however, an argument can be made that the *Brown* court simply did not address the "new and distinct crime" exception to the exclusionary rule in non-retaliatory situations. Even if this

were the case, this Court finds that such crimes should not come within the exclusionary rule exception for public policy reasons. In this regard, the Court finds the rationale of the New Mexico Court of Appeals supporting such a holding persuasive.

In *New Mexico v. Tapia*, the court addressed the issue of whether the exclusionary rule applies to crimes of concealing identity and forgery (by signing a false name on a traffic citation) committed after an illegal vehicular stop based on an alleged seat belt violation. 348 P.3d 1050, 1051-52 (N.M. App. 2015). The court first noted that "[t]he focus of the federal exclusionary rule analysis is whether the exclusion of evidence obtained illegally would deter *Fourth Amendment* violations in the future; that is, whether 'the benefits of deterrence . . . outweigh the [social] costs' of excluding the evidence." *Id.* at 1053 (quoting *Herring v. United States*, 555 U.S. 139, 141 (2009)). After discussing cases from several other jurisdictions, the court concluded that "the policy reasons for recognizing a new crime exception to the exclusionary rule simply do not exist when a non-violent, identity-related offense is committed in response to unconstitutional police conduct. On the other hand, applying the exclusionary rule in such circumstances advances its purpose of deterring unlawful police conduct." *Id.* at 1055. The court, therefore, held that "the commission of a non-violent, identity-related offense in response to unconstitutional police conduct does not automatically purge the taint of the unlawful police conduct." *Id.* at 1056.

The same public-policy argument applies with respect to the routine traffic infractions allegedly committed by Augustus. If the traffic infraction had been evading or eluding police, then there would be no new crime, as the driver would not have acceded to the authority of law enforcement. Applying the exclusionary rule to preclude evidence of routine traffic infractions advances the goal of deterring unlawful police conduct. Arguably, there is even a stronger argument for exclusion here; whereas the concealing identity and forgery in *Tapia* were in response to the illegal seizure, the alleged traffic infractions here were not.

The Court, therefore, finds that Augustus' alleged commission of the traffic offenses subsequent to unconstitutional police conduct does not purge the taint of the illegal seizure, and evidence of those offenses is suppressed.

Based on the circumstances present here, including the fact that the alleged traffic infractions are very closely related in time to the illegal seizure stemming from the alleged drug transaction, the Court also finds that evidence of the traffic infractions was derivative of and not sufficiently removed from the illegal act. The taint of the illegal stop, therefore, precludes admission of the evidence under the attenuation exception to the exclusionary rule. *See Warlick v. Commonwealth*, 215 Va. 263, 266, 208 S.E.2d 746, 748 (1974); *see also Kyer v. Commonwealth*, 45 Va. App. 473, 483, 612 S.E.2d 213, 218-19) (2005) (*en banc*) (noting that the attenuation analysis must consider all of circumstances of the case).

*3. Reasonable, Articulable Suspicion That Augustus Committed Traffic Infractions Did Not Exist*

The Commonwealth asserts that, independently of the alleged drug transaction, there was reasonable, articulable suspicion to support an investigatory stop of Augustus based on observed traffic infractions. Augustus, on the other hand, contends that the circumstances do not support reasonable suspicion.

The Court finds that there was not reasonable suspicion of traffic infractions based on what Gillespie observed after he energized his emergency equipment. Hence, even if, *arguendo*, evidence regarding the alleged traffic infractions were admissible, the lack of reasonable suspicion regarding the traffic infractions combined with the lack of reasonable suspicion regarding the drug transaction makes the vehicular stop illegal.

Of note, the testimony is clear that the alleged traffic infractions occurred only *after* Gillespie activated his vehicle emergency equipment and while Augustus' truck traveled less than two blocks. Gillespie testified that, during this time, he observed the following: (1) Augustus' truck speed up (although not above the posted speed limit); (2) Augustus appear to "stand up" inside his truck; (3) and Augustus' truck weave several times within its lane. Although Gillespie testified that he "was not concerned" about the alleged traffic infractions, his subjective conclusion is not dispositive and, in fact, is not relevant. Based on the record, it appears that Augustus was not cited for any traffic infractions.

As the Virginia Court of Appeals stated in *Armstead v. Commonwealth*:

> [F]aced with a suppression motion, a court should not limit itself "to what the stopping officer says or to evidence of his subjective rationale," *Raab v. Commonwealth*, 50 Va. App. 577, 583, n. 2, 652 S.E.2d 144, 148, n. 2 (2007) (*en banc*) (citation omitted), but should look instead to what a reasonable, objective officer could have concluded from the totality of the circumstances. "Just as a subjective belief by the arresting officer would not establish probable cause where none existed, a subjective belief by the arresting officer cannot destroy probable cause where it exists." *United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991); *cf. Jones v. Commonwealth*, 279 Va. 665, 673, 691 S.E.2d 801, 805 (2010) (holding an "officer's subjective characterization of observed conduct is not relevant to a court's analysis concerning whether there is a reasonable suspicion because the Court's review of whether there was reasonable suspicion involves

application of an objective rather than a subjective standard" (citation omitted)).

56 Va. App. 569, 579, n. 7, 695 S.E.2d 561, 565, n. 7 (2010).

With respect to Augustus' truck speeding up, the Court finds that, in light of the truck not exceeding the posted speed limit and ultimately stopping in less than two blocks, a reasonable, objective officer would not conclude that reasonable suspicion of criminal activity existed. Even with the observed movement within the truck cabin, the alleged "standing up" of the driver, and the weaving, which is discussed in more detail below, the Court finds that the totality of the circumstances does not support reasonable suspicion of criminal activity. The Court gives great weight to the fact that Augustus pulled over after traveling *less than two blocks* from where Gillespie activated his vehicle emergency equipment and that these alleged traffic infractions occurred only *after* the equipment was energized.

Although there was no testimony regarding the exact distance between where Gillespie activated his vehicle emergency equipment and where Augustus stopped, based on the exhibits admitted at the hearing the Court finds that the distance was less than 200 yards, or approximately 0.1 miles. Of note, the parties stipulated that the distance from where the alleged drug transaction took place to where Augustus stopped was approximately 0.4 miles. (Tr. 145.)

Although vehicular speed changes and movement within a vehicle certainly can contribute to a totality-of-the-circumstances analysis, the Court is unaware of any cases in which facts similar to those present here supported reasonable suspicion of criminal activity. There is, however, authority regarding the impact of vehicular weaving.

Virginia appellate courts have found that vehicular weaving can support reasonable, articulable suspicion of criminal activity, most notably in cases involving suspicion of driving under the influence ("DUI"). Three cases in particular are instructive: *Neal v. Commonwealth*, 27 Va. App. 233, 498 S.E.2d 422 (1998); *King v. Commonwealth*, 1995 Va. App. LEXIS 8 (Va. App. Jan. 3, 1995); and *Commonwealth v. Webb*, 56 Va. Cir. 419 (City of Danville 2001). In *Neal*, the Court of Appeals found that repeated weaving within a lane, five to ten times over 0.5 miles spanning twenty-five seconds and witnessed by an officer with "experience with intoxicated drivers," was *sufficient* for reasonable suspicion. *Neal*, 27 Va. App. at 239, 498 S.E.2d at 425. In *King*, the Court of Appeals, by contrast, held that a "momentary drift" across a lane divider after unrequired stopping at a yield sign was *insufficient* for reasonable suspicion. *King*, 1995 Va. App. LEXIS at *3-4. The facts in *Webb* fell somewhere between those in *Neal* and *King*; there, the court found that "one complete cycle" of weaving over 0.3 to 0.5 miles was *insufficient* for reasonable suspicion. *Webb*, 56 Va. Cir. at 420.

In assessing reasonable suspicion when considering the totality of the circumstances, the Court of Appeals has indicated that the proper test to

evaluate vehicular weaving is not based on a particular distance or number of sinusoidal paths. Rather, the analysis is whether the weaving in question constitutes an "isolated instance" of mild weaving; if so, it is insufficient to justify an investigatory stop. *Neal*, 27 Va. App. at 239, 498 S.E.2d at 425. In reaching this conclusion, the court relied in part on cases from other jurisdictions that held that weaving within a traffic lane is sufficient to justify an investigatory stop. *See id.* at 239-39, 498 S.E.2d at 425 (citing, *inter alia*, *State v. Malaney*, 871 S.W.2d 634 (Mo. App. 1994) (finding that an investigatory stop was reasonable where the officer observed a vehicle weaving within its lane three times over a distance of one mile)).

In *King*, there was an isolated instance of erratic driving, "a momentary drift across a lane divider between lanes traveling in the same direction." *King*, 1995 Va. App. LEXIS at *3-4. The court found that the defendant's unnecessarily stopping at a yield sign was not erratic, but rather a "reasonable act of a cautious driver." *Id.* at *3. The *King* court, therefore, relied solely on the single drift across the lane divider to find a lack of reasonable, articulable suspicion. Similarly, in *Webb*, the court characterized the single cycle of weaving "to be more in the nature of an *isolated instance* of mild weaving as opposed to constant weaving." *Id.* (emphasis added). This Court finds that, as in *King* and *Webb*, there was only an isolated instance of Augustus' vehicle mildly weaving within a traffic lane over a very short distance.

Here, Augustus' truck weaved several times within its lane over less than two blocks and only after the vehicle immediately behind Augustus' truck had its emergency lights and siren energized. The distance traveled was far less than that in *Neal* and *Webb*, and this case does not involve a lane crossing as in *King*. The Court notes that Augustus' truck necessarily crossed outside the lane of traffic when it left the main road in order to stop in response to Gillespie's activated police vehicle emergency equipment. Additionally, unlike in *Neal, King,* and *Webb*, here, there was no testimony that Gillespie had any particular experience with suspected DUI cases or other cases involving weaving. Gillespie did, however, testify that he had received some training on "DUI stops." (Tr. 109.) Presumably with this training in mind, Gillespie testified that the weaving was not of particular concern to him, as he was merely stopping the vehicle based on the report of alleged drug activity. (Tr. 106-07.)

The Court, therefore, concludes that the weaving here is insufficient to provide the reasonable suspicion necessary to justify an investigatory detention. The Court further finds that, even when the weaving is combined with the alleged "speeding up" and "standing up," the totality of the circumstances does not support a reasonable suspicion that Augustus had committed the alleged traffic infractions. *See Harris v. Commonwealth*, 276 Va. 689, 697, 668 S.E.2d 141, 147 (2008) ("Lawful conduct that the officer

may subjectively view as unusual is insufficient to generate a reasonable suspicion that the individual is involved in criminal activity." (citing cases)).

### 4. *Evidence of the Alleged Obstruction of Justice Is Not Suppressed Based on the "New and Distinct Crime" Exception to the Exclusionary Rule*

Augustus argues that, but for the illegal vehicular stop, law enforcement would not have encountered him at all; hence, there would not have been an opportunity for the alleged obstruction of justice. Augustus, therefore, claims that evidence regarding the obstruction is fruit of the poisonous tree. The Commonwealth's position is that the obstruction of justice charge can stand independently, regardless of whether there was reasonable suspicion for either the alleged drug transaction or the alleged traffic infractions and despite the exclusionary rule.

Of note, whether Augustus in fact obstructed justice is not before the Court at this time and, as discussed *infra*, actually is irrelevant to the issue of whether discovery of the cocaine during the custodial search ultimately should be suppressed. Rather, the relevant issue before the Court for purposes of the Motion To Suppress is whether evidence of the alleged obstruction of justice should be suppressed. The Court finds that it should not. Because this Court does not suppress the evidence of the alleged obstruction of justice, whether Augustus indeed obstructed justice is a matter for trial.

Although fruits of the poisonous tree stemming from an unconstitutional search normally are suppressed, the Virginia Court of Appeals has held that obstruction of justice after an illegal search or seizure is a new and distinct punishable crime, and any actions or words related to that crime are not subject to the exclusionary rule. *See Brown v. City of Danville*, 44 Va. App. 586, 600, 606 S.E.2d 523, 530 (2004). According to the court, "extending the fruits doctrine to immunize a defendant from arrest for *new* crimes [would give] a defendant an intolerable *carte blanche* to commit further criminal acts so long as they are sufficiently connected to the chain of causation started by the police misconduct." *Id.* at 602, 606 S.E.2d at 531 (quoting *United States v. Bailey*, 691 F.2d 1009, 1017 (11th Cir. 1982)).

In *Brown v. City of Danville*, Brown resisted an unlawful police pat down, resulting in a struggle. *Id.* at 592-94, 606 S.E.2d at 527. After subduing Brown, police recovered cocaine from him. *Id.* at 594, 606 S.E.2d at 527. Brown was charged with obstruction of justice and possession of cocaine. *Id.* at 592, 606 S.E.2d at 527. The trial court granted the motion to suppress the cocaine because it was obtained as a result of the unlawful pat down; however, the court refused to suppress evidence of Brown's conduct relating to the obstruction of justice charge. *Id.* at 595, 606 S.E.2d at 528. The Virginia Court of Appeals affirmed, holding that "if a person engages in new and distinct criminal acts in response to unlawful police conduct, the

exclusionary rule does not apply, and evidence of the events constituting the new criminal activity, including testimony describing the defendant's own actions, is admissible." *Id.* at 600, 606 S.E.2d at 530.

The court cited cases from *numerous* jurisdictions to support the proposition that admission of evidence related to a retaliatory new and distinct crime trumps the exclusionary rule. *Id.* at 600-02, 606 S.E.2d at 530-31. As one of the cited cases opined:

> The better basis of distinction [between this situation and a proper application of the "fruit of the poisonous tree" extension of the Exclusionary Rule] is that no exploitation of the prior illegality is involved and that the rationale of the exclusionary rule does not justify its extension to this extreme. Application of the exclusionary rule in such fashion . . . would in effect give the victims of illegal searches a license to assault and murder the officers involved — a result manifestly unacceptable.

*Id.* at 600, 606 S.E.2d at 530 (quoting *Napageak v. State*, 729 P.2d 893, 895, n. 2 (Alaska App. 1986) (quoting 3 W. LaFave, *Search and Seizure*, § 11.4(j), at 680 (1978) (alteration in original))).

Consistent with *Brown*, evidence of the events constituting Augustus' alleged obstruction of justice, including testimony describing Augustus' actions, is admissible as an exception to the exclusionary rule, despite his illegal seizure.

### 5. *Evidence Discovered as a Result of the Drug-Dog Search and Custodial Search Is Not Admissible*

The Commonwealth claims that evidence from the custodial search is admissible even without reasonable suspicion stemming from the alleged drug transaction and traffic infractions. It asserts that, because the drug dog alerted and because Augustus obstructed justice by not exiting his truck when instructed to do so by police officers, the associated search of Augustus at the scene and the custodial search of Augustus at the POC, which revealed the drugs at issue, was independently justified. Augustus, by contrast, claims that, absent reasonable suspicion for the vehicular stop, the searches constituted fruit of the poisonous tree. The Court finds that, in light of the lack of reasonable suspicion for the stop and despite the admissibility of evidence regarding the alleged obstruction of justice, evidence from the custodial search of Augustus both at the scene and at the POC is inadmissible pursuant to the exclusionary rule.

Although a dog sniff by itself is not a search for Fourth Amendment purposes, *Illinois v. Caballes*, 543 U.S. 405, 409 (2005), reasonable suspicion to support the sniff — whether to extend the duration of a traffic stop or to seize the vehicle in order to conduct the sniff — is necessary.

*Lawson v. Commonwealth*, 55 Va. App. 549, 558, 687 S.E.2d 94, 98 (2010). In other words, with facts such as those present here, without reasonable suspicion to stop the vehicle in the first place, there is no justification for the sniff after the stop. Although a drug-dog alert ordinarily provides probable cause to search an automobile, *Wright v. Commonwealth*, 52 Va. App. 263, 271, 663 S.E.2d 108, 113 (2008), an alert from an impermissible dog sniff must be suppressed. *Caballes*, 543 U.S. at 409 (holding that to prevent infringement on a constitutionally protected privacy interest a dog sniff conducted during a traffic stop must be *"lawful at its inception* and otherwise executed in a reasonable manner" (emphasis added)). There also was no evidence presented that there was particularized probable cause that Augustus had drugs on his person; so, although the drug-dog alert may have provided justification to search *the vehicle*, it did not provide justification to search Augustus' person. *Whitehead v. Commonwealth*, 278 Va. 300, 313, 683 S.E.2d 299, 305 (2009).

Without the intervening obstruction of justice, evidence from the custodial search, which stemmed from an illegal vehicular stop, clearly would be suppressed as fruit of the poisonous tree. The remaining question before the Court is what effect, if any, the ruling not to suppress evidence related to the obstruction of justice has on the exclusionary rule analysis. Stated differently, the issue is whether probable cause from the obstruction of justice can justify the subsequent custodial search, given that the opportunity for the obstruction came about only as a result of an illegal seizure.

Like the foundation for the "new and distinct crime" exception to the exclusionary rule, here, the admissibility of evidence from the custodial search is determined by balancing the benefits of deterrence with the social costs of excluding the evidence. The Court finds that allowing evidence from the custodial search would constitute an exploitation of the prior illegal seizure and that the rationale of the exclusionary rule, to deter unlawful police conduct, justifies its extension to the custodial search. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963) ("[T]he more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint'." (quoting Maguire, *Evidence of Guilt*, 221 (1959))). The Court, therefore, finds that, in light of the illegal seizure, admission of evidence related to the new crime, the obstruction of justice, does not affect suppression of the cocaine that resulted from the custodial search.

This Court's interpretation is consistent with the Virginia Court of Appeals' holding in *Brown* regarding the "new or distinct crime" exception. There, the court held that the exception applies to subsequent criminal acts *in response to unlawful police conduct* and limits admissible evidence to *the events constituting the new criminal activity, including testimony*

*describing the defendant's own actions. Brown,* 44 Va. App. at 600, 606 S.E.2d at 530. The custodial search of Augustus was neither "in response to unlawful police conduct" nor part of "the events constituting the new criminal activity." Additionally, the trial court in *Brown* suppressed evidence from the illegal pat down despite admitting evidence related to the obstruction of justice. The trial court's suppression of the evidence from the pat down was not appealed. The Virginia Court of Appeals summarized the facts of *Brown* by stating that "[t]he trial court granted the motion to suppress as to the cocaine, because its discovery derived from the unlawful pat down, but it refused to suppress evidence of Brown's conduct relating to the obstruction of justice charge." *Gray v. Commonwealth,* 50 Va. App. 513, 516, 651 S.E.2d 400, 402 (2007) (citing *Brown,* 44 Va. App. at 595, 606 S.E.2d at 528).

Assuming without deciding that Augustus obstructed justice after the vehicular stop, evidence *related to the obstruction itself* is not barred by the exclusionary rule. Other fruits of the poisonous tree, stemming from the unconstitutional stop, are, however, barred. Whether Augustus obstructed justice, therefore, is irrelevant to the admissibility of evidence resulting from the custodial search, as that evidence must be suppressed with or without the "new crime," the alleged obstruction of justice, in light of the unconstitutional stop.

## Conclusion

The Court finds, based on the facts and circumstances present in this case, that reasonable, articulable suspicion to stop Augustus did not exist based on either the alleged drug transaction or the alleged traffic infractions. The Court, therefore, suppresses all evidence related to the alleged drug transaction and the alleged traffic infractions. Evidence related to the alleged obstruction of justice, however, is not suppressed, as that evidence relates to a new and distinct retaliatory crime that purges the taint of Augustus' illegal seizure. Even had Augustus obstructed justice, any evidence related to the drugs ultimately adduced during the custodial search resulted only from an unconstitutional seizure and, therefore, are suppressed.

The Court grants Augustus' Motion To Suppress all evidence and statements resulting from the stop and subsequent custodial search except for evidence related to events constituting Augustus' alleged obstruction of justice.